**TUCKER et al. v. UNITED STATES.**

(Circuit Court of Appeals, Eighth Circuit. March 26, 1925.)

No. 6658.

**1. Post office ⬤⇒35—Offense of using mails to defraud consists of both scheme to defraud and mailing advertisement.**

The elements of an offense under Penal Code, § 215 (Comp. St. § 10385), are (1) a scheme or artifice devised or intended to be devised to defraud, and (2) causing an advertisement to be placed in the post office, to be sent or delivered by post office establishment, for purpose of executing such scheme or artifice, or attempting to do so.

**2. Post office ⬤⇒50—In absence of proof of mailing, verdict should have been directed for defendants.**

In prosecution for using mails to defraud, in violation of Penal Code, § 215 (Comp. St. § 10385), where there was no evidence that defendants caused insertion in newspaper of alleged fraudulent advertisements, verdict of acquittal should have been directed.

**3. Witnesses ⬤⇒301—Compelling accused on cross-examination to answer questions not relevant to examination in chief held invasion of privilege against self-incrimination.**

In prosecution for using mails to defraud, in violation of Penal Code, § 215 (Comp. St. § 10385), where one defendant testified only as to alleged fraudulent plan and his good faith in matter, and made no reference to insertion or mailing of advertisements, requiring him on cross-examination to testify as to who inserted the advertisements was an invasion of his privilege against self-incrimination, guaranteed by Const. Amend. 5, and by Act March 16, 1878 (Comp. St. § 1465).

**4. Witnesses ⬤⇒277(1), 319—Accused, voluntarily becoming witness, subjects himself to cross-examination and impeachment to no greater extent than other witnesses in same situation.**

One accused of crime, who voluntarily becomes a witness in his own behalf, subjects himself to cross-examination and impeachment to the same extent as any other witness in the same situation, but to no greater extent.

**5. Witnesses ⬤⇒269(1)—Cross-examination of witness should be confined to subjects of direct examination.**

A party in a civil or criminal case, in whose behalf a witness is called, has the right to restrain cross-examination to the subjects of his direct examination, and violation of this right is reversible error.

In Error to the District Court of the United States for the Western District of Oklahoma.

Dudley R. Tucker and others were convicted of using the mails to promote frauds, in violation of Penal Code, § 215 (Comp. St. § 10385), and they bring error. Reversed, with instructions to grant new trial.

S. P. Freeling, of Oklahoma City, Okl. (J. I. Howard, of Oklahoma City, Okl., on the brief), for plaintiffs in error.

J. W. Scothorn, Asst. U. S. Atty., of Oklahoma City, Okl. (W. A. Maurer, U. S. Atty., and James A. Ingraham and Roy St. Lewis, Asst. U. S. Attys., all of Oklahoma City, Okl., on the brief), for defendant in error.

Before KENYON, Circuit Judge, and TRIEBER and PHILLIPS, District Judges.

PHILLIPS, District Judge. Dudley R. Tucker, William L. Tucker, and Howard A.

Tucker, hereinafter called defendants, were charged by indictment with the violation of section 215 of the Penal Code (25 Stat. 873 [Comp. St. § 10385]). The indictment contained five counts. The first count charged that the defendants, having devised a scheme and artifice to defraud certain persons named in that count, on the 15th day of September, 1920, for the purpose of executing such scheme and artifice to defraud, caused to be placed in the United States post office at Oklahoma City, Okl., for mailing and delivery by the post office establishment of the United States, a certain newspaper, to wit, the Daily Oklahoman, which contained an advertisement, prepared by the defendants and printed in said newspaper at the special instance and request of the defendants, in words and figures following, to wit:

"Very attractive proposition open to responsible man who can invest $2,000 cash; pays $60 per week and all expenses; handling road picture shows; playing in Oklahoma towns. Investment guaranteed. Tucker Bros. Amusement Co., 310½ W. Main St., Dreamland Theatre. Phone M 1192 or M 5620."

The first count further alleged in detail the scheme and artifice to defraud and the means and methods by which the defendants intended to carry out the same.

The remaining counts were substantially the same as the first count, except the second charged the placing of the newspaper in the post office on the 16th day of November, 1920, and the following advertisement:

"Have attractive proposition open to responsible man who can invest $2,000 cash; pays $50 per week and all expenses; handling road picture shows; playing in Oklahoma towns. Investment guaranteed. Tucker Bros. Amusement Co., 306 W. Reno St., Oklahoma City, Okla. Phone M 5620."

And the third count charged the placing of the newspaper in the post office on the 21st day of November, 1920, and the following advertisement:

"Have very attractive proposition open to responsible man who can invest $2,000 cash; pays $50 per week and all expenses; handling road picture shows; playing Oklahoma towns. Investment guaranteed. Tucker Bros. Amusement Co., 306 W. Reno St., Oklahoma City, Okla. Phone M 5620."

And the fourth count charged the placing in the newspaper in the post office on the 2d day of December, 1920, and the following advertisement:

"Have very attractive proposition open to responsible man who can invest $2,000 cash; pays $50 per week and all expenses; handling road picture shows; playing in Oklahoma towns; investment guaranteed. Tucker Bros. Amusement Co., 306 W. Reno St., Oklahoma City, Okla. Phone M 5620."

And the fifth count charged the placing of the newspaper in the post office on the 14th day of December, 1920, and the following advertisement:

"Steady employment offered responsible man who can invest $1,000 cash bond; paying $40 per week, salary and all expenses; handling Tucker Bros. Road Picture shows; playing Oklahoma, Texas and Arkansas towns. Deposit secured and guaranteed; money can be withdrawn on two weeks notice; no experience necessary. Tucker Bros. Amusement Co., 306 W. Reno St., Oklahoma City, Okla. Phone M 5620."

The assignments of error may be grouped under three principal contentions:

First, that the trial court erred in admitting over objection Government's Exhibit 1, being a copy of the Daily Oklahoman of September 15, 1920, containing the advertisement alleged in count 1; Government's Exhibit 2, being a copy of the Daily Oklahoman of November 16, 1920, containing the advertisement alleged in count 2; Government's Exhibit 3, being a copy of the Daily Oklahoman of November 21, 1920, containing a copy of the advertisement alleged in count 3; Government's Exhibit 4, being a copy of the Daily Oklahoman of December 2, 1920, containing a copy of the advertisement alleged in count 4; and Government's Exhibit 5, being a copy of the Daily Oklahoman of December 14, 1920, containing an advertisement similar to the advertisement alleged in count 5.

Second, that the trial court erred in overruling the motion of the defendants, for a directed verdict of not guilty, on counts 1, 2, 3, and 4.

Third, that the trial court erred in requiring the defendant Dudley R. Tucker to answer on cross-examination whether he had inserted or caused to be inserted, in the Daily Oklahoman, the advertisements alleged in the several counts of the indictment.

[1] The crimes charged are made up of two principal elements: (1) A scheme or artifice devised or intended to be devised to defraud; (2) causing an advertisement to be placed in the post office to be sent or delivered by the post office establishment of the United States, for the purpose of executing such scheme or artifice, or attempting so to do. Robins v. U. S. (C. C. A. 8) 262 F. 126; Bowers v. U. S. (C. C. A. 9) 244 F. 641, 157

C. C. A. 89; U. S. v. Young, 232 U. S. 155, 34 S. Ct. 303, 58 L. Ed. 548.

In the Young Case the court said:

" * * * The elements of an offense under section 215 are (a) a scheme devised or intended to be devised to defraud, or for obtaining money or property by means of false pretenses, and (b) for the purpose of executing such scheme or attempting to do so, the placing of any letter in any post office of the United States to be sent or delivered by the post office establishment."

The first two contentions relied on by defendants may be treated together, and require an examination of the evidence offered to prove the second element of the offenses charged.

In the government's case in chief there was no direct evidence that the defendants, or any of them, caused the advertisements alleged in the indictment to be inserted in the Daily Oklahoman.

For the purpose of establishing that defendants caused such advertisements to be inserted, the government called a number of witnesses, who testified that they called on Dudley Tucker and advised him they had read an advertisement of Tucker Bros. in the Daily Oklahoman and wanted to know about the proposition, and that Dudley Tucker then explained the plan to them and employed them for Tucker Bros.

Keeping in mind that the copy of the advertisements was changed from time to time, let us examine the testimony of these witnesses with reference to the point under consideration:

W. A. Harris testified that he read advertisements in issues of about July 4, 1920.

L. L. Prosser testified that he called on Dudley Tucker in response to an advertisement, and thereafter entered into a contract with Tucker Bros. The contract was dated August 19, 1920.

N. E. Weaver testified that he learned of Tucker Bros.' proposition from other employees of Tucker Bros.; that later he saw an advertisement in the paper and wrote Tucker Bros. and asked if they were still wanting men. He received a reply dated September 21, 1921.

Charles Geiger testified that he read an advertisement in the Daily Oklahoman; that he met Dudley Tucker and William Tucker September 30, 1920, and told them he had read their advertisement; that Dudley Tucker explained the proposition and gave Geiger to understand it was Tucker Bros.' advertisement he had read; that he entered into a contract with Tucker Bros., dated October 11,

1920; that he saw the advertisement in an issue published during September; that the advertisement did not say anything about invest or investment, but said the person would have to put up a $2,000 cash bond; and that he "did not see an ad stating an attractive proposition could be offered to a responsible man who would invest."

R. C. Dohe testified that he saw an advertisement published between January 5 and 15, 1921; that the advertisement said "Men who could put up bond of $1,000 or $2,000"; that he could not say the advertisement was the same as those set forth in Government's Exhibits 1, 2, 3, 4, and 5.

Charles H. Darling testified that he answered Tucker Bros.' advertisement by letter and received a letter in reply dated January 6, 1921; that he then called on Dudley Tucker and entered into a contract dated January 11, 1921.

Roy L. Bradshaw testified that he saw advertisements in February, 1921, and that he thereafter called upon Dudley Tucker and entered into a contract with Tucker Bros.

S. R. Walker testified that he saw advertisement and called on Dudley Tucker February 10, 1921.

J. H. Roberts testified that he saw the advertisements in the fall of 1920, and in January and February, 1921; that on February 26, 1921, he met Dudley Tucker, told him he "had noticed these advertisements in the paper," and "had come down to get his proposition on it."

Frank Gresham testified that he "read advertisements in various newspapers signed by Tucker Bros. Amusement Company, saying they wanted reliable men who could deposit cash bond of $1,000; that they would pay $40 a week salary"; that between February 20 and 25, 1921, he called on Tucker Bros. and discussed proposition with Dudley Tucker; that he only discussed advertisement which read $1,000 deposit and $40 a week"; and that he inquired only as to the $1,000 proposition.

I. L. Sheets testified that he read an advertisement of Tucker Bros. in the Daily Oklahoman, published about the middle of December, 1920; that he answered the advertisement, and met Dudley Tucker, the latter part of December, 1920.

E. K. McKinnis testified that he saw the advertisement alleged in count 5 in December, 1920; that he wrote a letter to Tucker Bros. inclosing copy of the advertisement; that later he met Dudley Tucker in Oklahoma City in January, 1921, and discussed

the advertisement and the men who had been employed under it.

R. M. Cook testified that he read an advertisement in an issue of the Daily Oklahoman of about the middle of December, 1920; that he wrote a letter to Tucker Bros. relative to the proposition and received a reply dated December 23, 1920; that shortly thereafter he went to Oklahoma City, met Dudley Tucker, and signed a contract with Tucker Bros., dated December 31, 1920.

Clyde Brown testified: "I saw an ad in the Daily Oklahoman wanting men at $40 a week with $1,000 deposit, this $1,000 to be used on a bond, and I went up to see him about it"; that he saw Dudley Tucker January 2, 1921, and discussed the proposition set out in the advertisement.

From the foregoing it is clear that, with the possible exception of Weaver, none of these witnesses discussed with Dudley Tucker any of the advertisements charged in counts 1, 2, 3, and 4. While Geiger testified to an advertisement published in September, he testified specifically as to what appeared in the advertisement, and showed clearly that it was not the one charged in the first count of the indictment. McKinnis identified the advertisement charged in the fifth count, and the testimony of Sheets, Gresham, Brown, and Cook may have referred to that advertisement. However, there was a variance between the allegation and the proof on the fifth count, and the jury returned a verdict of not guilty under the instructions of the court. Weaver may have referred to the advertisement charged in the first count. Wherever the witnesses were specific in their testimony, they described an advertisement substantially different from those charged in the first, second, third, and fourth counts. None of the witnesses discussed with Dudley Tucker the advertisement of December 2d, charged in the fourth count, upon which the verdict of guilty was returned. None of the witnesses talked to either William Tucker or Howard Tucker.

To establish the insertion by the defendants of the advertisements charged in the indictment, the government also offered the testimony of H. E. Dreier, advertising manager, and Edwin C. Barthell, assistant advertising manager, of the Daily Oklahoman and Times, Mrs. C. A. Cunningham, a stenographer for Tucker Bros., and M. C. Nabb, bookkeeper, and F. S. Baird, collector, for the Oklahoman Publishing Company.

Dreier identified Government's Exhibits 1, 2, 3, 4, and 5, as regular issues of the Daily Oklahoman containing the advertisements charged in the indictment, but testified that he did not know of his own knowledge who furnished the copy for the advertisements, who directed their insertion, or who paid for them.

Barthell testified that he found four copies of advertisements in the files, and gave them to the post office inspector; that he knew nothing of his own knowledge concerning them; that he did not know who brought the advertisements in, or who received them; and that he could not say any of the defendants brought the copies of the advertisements to the Daily Oklahoman.

Mrs. Cunningham testified that she commenced to work for Tucker Bros. December 18, 1920, and did not know of the writing or insertion of any advertisement in the Daily Oklahoman prior to December 19, 1921.

The government sought to prove by the witnesses Nabb and Barthell that the defendants paid for the advertisements. It appeared that these witnesses had no personal knowledge of the transactions, and on motion of defendants their evidence was stricken out and taken from the jury.

[2] The record is certainly void of any evidence that the defendants William Tucker and Howard Tucker caused the insertion in the Daily Oklahoman of any of the advertisements charged in the several counts of the indictment. As against them there was no proof of the second element of the offenses charged. The court should have directed the jury to find William Tucker and Howard Tucker not guilty.

A finding from the evidence that Dudley Tucker caused the advertisement of December 2, 1920, to be inserted in the Daily Oklahoman would be largely a matter of surmise and conjecture. But, since the case must be reversed as to Dudley Tucker on another point, we are not required to determine whether or not there was sufficient evidence to warrant the submission of the case to the jury as against Dudley Tucker.

The question raised by the third contention is: Did the court, in requiring the witness Dudley Tucker, over objection, to answer whether or not he caused the advertisements alleged in counts 1, 2, 3, and 4, to be inserted in the Daily Oklahoman, compel him to be a witness against himself, in violation of the protection guaranteed to him under the Fifth Amendment to the Constitution of the United States?

The fraudulent scheme alleged and sought to be proved by the government was substantially this: That the defendants falsely represented that the amounts deposited with

Tucker Bros. by the persons who entered into employment contracts were merely to serve as bonds to insure the accounting by the employees for moneys collected and for the property intrusted to the employees, and that the amounts so deposited would be placed in Oklahoma City banks, held in trust, and returned upon demand after two weeks' notice; that such representations were false, in that the defendants intended to appropriate and did appropriate the moneys so deposited to their own use, and that the defendants intended thus to cheat such persons out of the moneys so deposited.

Dudley Tucker was called as a witness in behalf of the defendants. He testified to the plan he had worked out for operating road motion picture shows, and to what he stated to prospective employees, and to his good faith in the matter. He at no time in any way mentioned or referred to the advertisements or the insertion of the same in the newspaper. He made no reference to the statements concerning the advertisements testified to by the persons who called upon him in response to advertisements. In short, his direct testimony went wholly to a refutation of the first element of the offenses charged, namely, the scheme to defraud, and at no time went to the question of using the post office in furtherance of any such scheme.

[3] On cross-examination he was asked if he inserted or caused the insertion of the advertisements charged in the first four counts of the indictment. Objection was interposed to the effect that such questions were outside the scope of the direct examination, were therefore improper cross-examination, and in effect made Dudley Tucker the government's witness, and compelled him to be a witness against himself.

The privilege against self-incrimination was first recognized by the common-law courts in England about the middle of the seventeenth century. 8 R. C. L. § 32, p. 77; Wigmore on Evidence (2d Ed.) vol. 4, pp. 814, 815. An excellent discussion of the historical development of the privilege by the learned author of Wigmore on Evidence may be found in volume 4 of his second edition at section 2250. It found expression in the maxim "nemo tenetur seipsum accusare." It was written into the Constitution of the United States by the Fifth Amendment, which provides: "No person * * * * shall be compelled in any criminal case to be a witness against himself." However, since only within comparatively modern times has the accused been a competent witness in his own behalf, the facts surrounding the historical development of this privilege afford little aid in the determination of the precise question here presented.

By the Act of March 16, 1878, 20 Stat. 30 (Comp. St. § 1465), Congress provided that "the person so charged shall, at his own request, but not otherwise, be a competent witness. And his failure to make such request shall not create any presumption against him." What is the effect of the defendant availing himself of this statute and testifying in his own behalf upon the privilege guaranteed to him by the Fifth Amendment? All courts recognize that he subjects himself to cross-examination. So far as we have been able to determine no court or legal writer has suggested that after the accused has testified in his own behalf he can be called as a witness against himself by the prosecution. If the accused testifies in his own behalf, manifestly his testimony should be subjected to the same tests for determining its truthfulness as that of any other witness. The primary purpose of cross-examination in the federal courts is to test the truth of the testimony adduced by the direct examination and to clarify or explain the same. It is not to prove independent facts in the case of the cross-examining party.

If there is good reason why a defendant should not be compelled to be a witness against himself, there ought to be equally good reason why, if he has testified voluntarily upon one issue, he should not be compelled to testify against his will concerning matters wholly unrelated to that issue, which would not be within the scope of proper cross-examination if he were an ordinary witness.

[4] We conclude that, when a defendant in a criminal case voluntarily becomes a witness in his own behalf, he subjects himself to cross-examination and impeachment to the same extent as any other witness in the same situation, but he does not subject himself to cross-examination and impeachment to any greater extent. Harrold v. Territory of Oklahoma (C. C. A. 8) 169 F. 47, 94 C. C. A. 415, 17 Ann. Cas. 868; Paquin v. U. S. (C. C. A. 8) 251 F. 579, 163 C. C. A. 573; Fitzpatrick v. U. S., 178 U. S. 304, 315, 316, 20 S. Ct. 944, 44 L. Ed. 1078; Sawyer v. U. S., 202 U. S. 150, 165, 26 S. Ct. 575, 50 L. Ed. 972, 6 Ann. Cas. 269.

To sustain the ruling of the learned trial judge, counsel for the government cite and rely upon the following cases: Quintana v. State, 29 Tex. App. 401, 16 S. W. 258, 25 Am. St. Rep. 730; People v. Bussey, 82 Mich. 49, 46 N. W. 97; State v. Ober, 52

N. H. 459, 13 Am. Rep. 88; Commonwealth v. Nichols, 114 Mass. 285, 19 Am. Rep. 346; Andrews v. Frye, 104 Mass. 234; Commonwealth v. Lannan, 13 Allen (Mass.) 563; Commonwealth v. Mullen, 97 Mass. 545. The above cases generally recognize the rule that the defendant who offers himself as a witness in his own behalf subjects himself to cross-examination the same as any other witness, but hold that the cross-examination may include any question pertinent to the issues. We find, however, that is the rule regulating the scope of cross-examination of an ordinary witness in those jurisdictions.

In the case of Wentworth v. Crawford, 11 Tex. 127, 133, the court said:

"We believe that it is regular to ask a witness, on a cross-examination, any question that may be pertinent to the questions to be decided by the jury."

In the case of Ireland v. Cincinnati, W. & M. R. Co., 79 Mich. 163, 164, 44 N. W. 426, the court said:

"The rule is well established that a witness may be cross-examined upon all points material to the issue, whether the party has called them out upon direct examination or not." .

See, also, Hemminger v. Western Assurance Co., 95 Mich. 355, 54 N. W. 949, and People v. Dupounce, 133 Mich. 1, 94 N. W. 388, 103 Am. St. Rep. 435, 2 Ann. Cas. 246.

In the case of Commonwealth v. Morgan, 107 Mass. 199, 205, the court said:

"By taking the stand as a witness, he waived his constitutional privilege of refusing to furnish evidence against himself, and subjected himself to be treated as a witness. Stat. 1866, c. 260; Commonwealth v. Mullen, 97 Mass. 545; Commonwealth v. Bonner, Id. 587. Under our rule, the cross-examination of a witness is not confined to the matters inquired of in chief. Moody v. Rowell, 17 Pick. 490, 498."

In Webster v. Lee, 5 Mass. 334, the court said:

The opponent "might very properly cross-examine him as to all matters pertinent to the issue on trial."

In Merrill v. Berkshire, 11 Pick. (Mass.). 269, 274, the court said:

"He was sworn generally in the suit, and cannot be restricted in his testimony, to facts relating to such individual or such parts of the case as the party calling him may choose to select."

In Commonwealth v. Hudson, 11 Gray (Mass.) 64, 67, the court said:

"A witness, when called by one party, is liable to be examined and bound to answer as to all facts material to the case, whether examined upon that subject by the party calling him or not."

See, also, Moody v. Rowell, 17 Pick. (Mass.) 490, 499, 28 Am. Dec. 317; Beal v. Nichols, 2 Gray (Mass.) 262; Conklin v. John Howard Industrial Home, 224 Mass. 222, 112 N. E. 606.

State v. Ober, supra, relied upon by counsel for the government, follows the Massachusetts cases.

From the foregoing it will be seen that the courts of Texas, Michigan, Massachusetts, and New Hampshire open a much broader field to the cross-examiner than do the national courts.

[5] The rule fixing the limitation upon the cross-examination of a witness generally in the national courts, is stated in Heard v. U. S. (C. C. A.) 255 F. 829, at page 833, 167 C. C. A. 157, 161, as follows:

"The rule on this subject in the national courts is that the party in whose behalf a witness is called has the right to restrict his cross-examination to the subjects of his direct examination, and a violation of this right is reversible error. If the cross-examiner would inquire of the witness concerning matters not opened on direct examination, he must call him in his own behalf. Philadelphia & Trenton Railway Co. v. Stimpson, 39 U. S. (14 Pet.) 448, 460, 10 L. Ed. 535; Houghton v. Jones, 1 Wall. 702, 706, 17 L. Ed. 503; Resurrection Gold Mining Co. v. Fortune Gold Mining Co., 129 Fed. 668, 674, 64 C. C. A. 180, and cases there cited; Illinois Central Railway Co. v. Nelson, 212 Fed. 69, 74, 128 C. C. A. 525; Harrold v. Territory of Oklahoma, 169 Fed. 47, 52, 94 C. C. A. 415, 17 Ann. Cas. 868."

See, also, Camp Mfg. Co. v. Beck (C. C. A. 4) 283 F. 705, 706.

The rule is the same in civil and criminal cases. Greer v. U. S. (C. C. A. 8) 240 F. 320, 323, 153 C. C. A. 246.

In Harrold v. Territory, supra, this court said:

"And right here is the limitation of the waiver by an accused person of his constitutional privilege under the second rule by testifying. * * * He may not 'be compelled in any criminal case to be a witness against himself.' When he testifies as a witness he waives this privilege of silence and subjects himself to cross-examination and impeachment to the same extent as any other witness would subject himself thereto in the same situation, but no farther. He may be cross-examined upon the subjects of his direct examination, but not upon other sub-

jects; impeaching questions relative to facts not collateral to the issue—that is to say, relative to facts which the prosecutor is entitled to prove as a part of his case—may be lawfully propounded to him (Wharton's Criminal Evidence [9th Ed.] § 484), but such questions relative to facts that may not be so proved may not be asked him; and he may be impeached by competent proof of statements made by him contradictory of his answers to such lawful questions, but not by proof of answers contradicting unlawful questions. For these are the limits of the cross-examination and of the lawful evidence of impeachment of other witnesses. An accused person who testifies to the single fact that a bill of sale or a deed was signed by the grantor does not thereby waive his privilege to refuse to testify upon every other material issue in his case. He waives his privilege of silence upon the subjects relative to which he testifies, but upon no other."

In Fitzpatrick v. U. S., supra, the court said:

"Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf and makes his own statement, it is clear that the prosecution has a right to cross-examine him upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts. * * * If the prosecution should go farther and compel the defendant, on cross-examination, to write his own name or that of another person, when he had not testified in reference thereto in his direct examination, the case of State v. Lurch, 12 Or. 99, is authority for saying that this would be error. It would be a clear case of the defendant being compelled to furnish original evidence against himself. State v. Saunders, 14 Or. 300, is also authority for the proposition that he cannot be compelled to answer as to any facts not relevant to his direct examination."

The questions asked the witness Dudley Tucker on cross-examination were clearly outside the scope of his direct testimony. They had reference to the second element of the offenses charged, while his direct examination was limited to a refutation of the first element. The questions on cross-examination did not in any way test the truth of the direct examination; they did not seek to explain or modify the same; they were asked for the sole purpose of proving an independent element in the government's case. In eliciting the answers to the questions propounded to Dudley Tucker with reference to the insertion of the advertisements, the government made Dudley Tucker its witness, and compelled him over seasonable and proper objection to be a witness against himself, in violation of the Fifth Amendment to the Constitution. There is no higher nor more important duty resting upon the courts than to see that the citizen is fully afforded the rights and immunities guaranteed to him by the Constitution.

For the reasons above stated, the cause is reversed, with instructions to grant the defendants a new trial; and it is so ordered.