**Eddie Rena HAMER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 15688.**

United States Court of Appeals Ninth Circuit.

Aug. 26, 1958.

Rehearing Denied Oct. 6, 1958.

Harry E. Weiss, Los Angeles, Cal., Ernest L. Graves, Wilmington, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Eugene N. Sherman, Lloyd F. Dunn, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before BARNES and HAMLEY, Circuit Judges, and CLARK, District Judge.

BARNES, Circuit Judge.

Appellant was convicted on two counts of a five count indictment. On one count she was acquitted by the jury—two counts were dismissed by the judge.

The two counts which resulted in convictions related to the alleged sale of 283 grains of heroin on September 11, 1956, and of 223 grains of heroin on September 24, 1956; the sale in each instance having been made to one William Farrington. These offenses were charged in violation of 21 U.S.C. § 174.[1] A timely appeal is taken here. 28 U.S.C. §§ 1291 and 1294.

Appellant raises five points on appeal, which we separately consider in turn.

I. Deprivation of Trial by Jury.

A glance at the record quickly indicates that defendant's convictions were the result of a jury trial. How then, can appellant claim a deprivation of the right to trial by jury? Because, says appellant, the right to a jury trial necessarily implies and includes the right to exclude jurors that are unfavorable, or that defendant may feel are unfavorable. In order to exercise this "right of exclusion," a defendant must have the right to challenge a juror. And further, argues appellant, this presupposes (a) a fair knowledge (i. e., knowledge before trial) of the jurors' identity, and (b) "an opportunity for investigation, examination and inspection of the proposed jurors, before challenge."

In appellant's words:

"The right to the names and addresses of jurors in advance of trial, and a right to a personal voir dire of the jurors, are not unrelated rights or procedures. The full untrammelled existence of one of (sic) the other or a combination of the substance of both is constitutionally mandatory."[2]

---

1. 21 U.S.C. § 174 reads as follows:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be be fined not more than $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,-000.

"Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury. * * *"

2. Appellant's Brief, p. 5.

Having in mind appellant's position on her first point, let us go to the factual situation in the instant case. We first turn to a bit of court history.

On February 28, 1951, there was filed in the United States District Court, Southern District of California, an order of court, reading as follows:

"It Is Hereby Ordered by the Court that neither the Clerk nor the Marshal shall reveal to anyone the names or addresses of persons called for juror duty, or jurors, except (1) Upon prior order of Court, or (2) Where required to do so by any applicable law, or (3) When done in connection with the summoning of or notification to jurors, or as certified in vouchers for payment of jury fees."

Upon the trial of this case, the trial judge, as was the practice in this district under the above rule, undertook to conduct the voir dire examination of the jurors. After explaining that the co-defendant was not being tried; that counts one and two had been dismissed as to defendant Hamer, and having read the indictments, the court advised the jury with respect to the presumption of innocence and the burden of proof on the government. Each prospective juror was then asked his business, and how long he had lived in Los Angeles County.

Counsel for Mrs. Hamer then disclosed his wish "to examine each person on voir dire extensively," and requested that right. The court denied the motion, but added: "If you have any questions you wish put to them, you may ask me." Counsel for appellant then asked that the jury *for the second time* be instructed that the mere fact of indictment is no indication of guilt. This the court did, twice more. The question of weight to be attached to the testimony of an accomplice was then raised by appellant's counsel. The court asked the prospective jury:

"Are there any of you who feel you would be unwilling to follow the law as stated in the instructions of the court, regardless of what that law may be? If so, please raise your hand. [no response]

"The Court: Anything further?

"Mr. Weiss: Nothing further.

"The Court: Both pass for cause? It is the government's peremptory."

After the exercise of three peremptory challenges by each party, counsel for appellant advised the court, out of the prospective jury's presence, that counsel for the government was using a green loose-leaf folder which apparently contained information as to how the jurors had previously voted. The court required government counsel to cease its use of such book and ordered that whoever compiled it be brought to court during the trial so that he might determine whether it purported to indicate how individual jurors had voted in previous trials, or merely how the jury as a whole had voted in previous trials. The defendant then exercised two more peremptories, and again had no more questions to suggest that the court should ask on voir dire. The jury was then accepted by both sides and sworn. An alternate was then questioned by the court, no further questions were requested by either side, no further challenges were exercised, and the alternate juror was sworn. Counsel for appellant did not exercise all the peremptory challenges available to him.

At a later time in the proceedings, out of the presence of the jury, a Mr. Louis Lee Abbott, then an assistant United States attorney, appeared before the court and made a statement to the court. Discussion in reference to the book continued. In this discussion the judge observed that it was highly unethical for any lawyer to interview members of a jury as to how their vote went or what took place in the jury room. To this Mr. Abbott replied that the book was *not* made up from information obtained in such a manner, that he believed it would come to his attention if any such interviews has occurred, and he knew of none. He stated that the book reflected things which occurred *in*

*open court;* that nothing in the book had been secured improperly; that it was based upon observation of jurors in *open court.* The court stated that the book had the *appearance* of impropriety. The court further observed that he was loathe to believe that any jurors had been interviewed, "in view of the Court of Appeals' flat declaration on the subject."[3] To this Mr. Abbott replied that he would be very much surprised if it had. *The court observed that counsel for appellant had challenged the rule of the court that the clerk is not permitted to give out the list of jurors who are to be chosen.*

Counsel for appellant made a statement to the court reviewing the position of counsel for appellant. That is, that he had asked to have the names and addresses of the jurors, and then had requested the right to personally examine the jury on voir dire, on the ground that it was a right constitutionally guaranteed, and necessary in view of the deprivation of the right to obtain the names of the people summoned for jury duty. Counsel additionally stated that the reason the book was brought to the court's attention was that it created an unequal situation in the selection of the jury. Counsel for appellant thereupon asked the court to examine the book in camera. This the court did.

At a later time in the proceedings, outside the presence of the jury, further discussion was had concerning the book turned over to the court. First the court reviewed the contents of the book indicating that it was a book compiled of various names of jurors who had served on cases in which deputy United States attorneys had appeared; that it contained comments in reference to the convictions or acquittals; that in one instance it contained information recurring twelve times throughout the book as to what an individual juror had done within the jury room.

Counsel for appellant requested that the book be kept sealed as an exhibit and made part of the record as evidence in support of his position that the book showed private communication with the jurors by the government. Counsel for appellant again referred to the fact that the rule which had theretofore been challenged was itself unconstitutional unless counsel had the right of personal voir dire. Counsel stated that the whole matter, including the book, should be put before an appellate court for determination of the rule involved. The court thereupon ordered that the United States attorney keep the book and make it available for the Court of Appeals. A motion for judgment of acquittal was made at the close of the government's case on the ground that the book had been used in the selection of the jury. This was denied.

 Appellant now vigorously urges that she was deprived by the court's rulings of the right to an impartial jury: first, by limiting voir dire, and second, by the court's refusal to rule a mistrial because the book was used. No cases are cited that *these facts* give rise to the deprivation of a constitutional right. The courts have repeatedly held that

"the mode of designating and impaneling jurors for the trial of cases in the courts of the United States is within the control of those courts, subject only to the restrictions Congress has prescribed, and also to such limitations as are recognized by the settled principles of criminal law to be essential in securing impartial juries for the trial of (criminal) offenses." Pointer v. United States, 1894, 151 U.S. 396, 407–408, 14 S.Ct. 410, 414, 38 L.Ed. 208.

Congress, in its wisdom, has seen fit to require that there be given advance notice, by service of jury lists, to defense counsel in certain classes of cases —primarily, treason and capital offenses. 18 U.S.C. § 3432. This statute has never been held applicable to non-capital

3. Rep.Tr., p. 48.

offenses.[4] United States v. Van Duzee, 1890, 140 U.S. 169, 11 S.Ct. 758, 35 L.Ed. 399; Scales v. United States, 4 Cir., 1955, 227 F.2d 581; Brown v. Johnson, 9 Cir., 1942, 126 F.2d 727; Spivey v. United States, 5 Cir., 1940, 100 F.2d 181, certiorari denied 310 U.S. 631, 60 S.Ct. 1079, 84 L.Ed. 1401; Wilson v. United States, 5 Cir., 1939, 104 F.2d 81, certiorari denied 308 U.S. 574, 60 S.Ct. 89, 84 L.Ed. 481; Hendrickson v. United States, 4 Cir., 1918, 249 F. 34; Shelp v. United States, 9 Cir., 1897, 81 F. 694.[5]

The very fact that Congress has seen fit to require the furnishing of the list of prospective jurors to defendants in the more serious capital offense cases alone, and not in the cases involving other lesser offenses, indicates that it found no necessity for such a rule in the lesser types of cases.

Appellant's remedy then, if any exists, is from the hands of Congress, not from the courts. The courts now are following the congressional intent and purpose.

The cases to which we have referred above do not discuss whether there a personal voir dire by defense counsel was allowed. But there also exists a line of cases determining that there is no constitutional right to a personal voir dire of the jury. Frederick v. United States, 9 Cir., 1947, 163 F.2d 536; Paschen v. United States, 7 Cir., 1934, 70 F.2d 491; Bonness v. United States, 9 Cir., 1927, 20 F.2d 754; Kurczak v. United States, 6 Cir., 1926, 14 F.2d 109; Underleider v. United States, 4 Cir., 1925,

5 F.2d 604. The holding of these cases has been embodied in rule 24(a) of the Federal Rules of Criminal Procedure.[6] These cases, however, do not discuss whether there was a view of the jury lists before trial.

Considered separately, both these rules seem sound and not violative of a defendant's constitutional rights. But the point which appellant here raises is that there is a denial of the right to an impartial jury, and thereby a fair jury trial, when *both* these requests are denied. Upon this question neither side has cited authorities.

A short answer might be that if there is no error separately, then there can be none when the two are combined. Provided that the selection of the jury when viewed as a whole is fair and impartial, such a test would comport with the Supreme Court's view of the basic premise of the due process clauses of the Fifth and Fourteenth Amendments of the Constitution. However we are not dealing with a claimed violation of the due process clause, but rather there is raised a specific denial of other constitutional safeguards.

Even in this aspect, however, there is helpful analogy. Under the right to counsel provisions of the Sixth Amendment the Supreme Court has held that a person may waive his right to counsel, provided the waiver is intelligently made when weighed against all the facts and circumstances of the case. United States v. Morgan, 1954, 346 U.S. 502, 74 S.Ct.

---

4. This position appears to be in accord with the Common Law of England in criminal cases (see 4 Blackstone, Commentaries § 396 (Jones ed. 1916); Treasson Act of 1695, 7 & 8 Will. 3, c. 3), until the Common Law Procedure Act of 1852 (15 & 16 Vict., c. 76, § 106) provided for public inspection of the panel of jurors summoned. (See 9 Halsbury, Laws of England, Criminal Law & Procedure § 216.) In civil actions the procedure allowed foreknowledge of the jury panel (3 Blackstone § 471).

5. As to the matter of the trial judge's discretion in matters pertaining to the voir dire examination, see Connors v. United States, 1895, 158 U.S. 408, 413, 15 S.

Ct. 951, 39 L.Ed. 1033; United States v. Lebron, 2 Cir., 1955, 222 F.2d 531.

6. "(a) *Examination.* The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper." (Fed.R. Crim.Proc. 24(a), 18 U.S.C.)

247, 98 L.Ed. 248; Adams v. United States ex rel. McCann, 1942, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268. And of course as applied under the due process clause of the Fourteenth Amendment the test is the over-all fairness of the trial, with counsel being absolutely required only in capital cases. Betts v. Brady, 1942, 316 U.S. 455, 62 S.Ct. 1252, 86 L. Ed. 1595; cf. Chessman v. Teets, 1957, 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253. Thus a similar test may well be used here to determine if the selection of the jury was fair so that an impartial jury was obtained. In this event the greatest emphasis must be placed upon the extent and sufficiency of the voir dire examination of the jury made by the trial judge.

We 'find the voir dire examination permitted and undertaken here by the trial judge was adequate and fair to insure defendant the unbiased selection of an impartial jury to which he was entitled. The trial court advised counsel that if he had any additional voir dire questions, he could request the court to ask them. No such request was made. When the court asked if there were anything further on the issue of challenges for cause, defendant's counsel stated, "Nothing further." We hold the voir dire examination in this case was sufficient.

We have examined the jury book used by government counsel.[7] The use of "jury books" showing how members of a jury panel voted on previous juries has long existed in our courts. It has been praised and criticized; attacked and defended. Many an experienced trial lawyer will insist that knowing how a juror votes on one case will not give the slightest indication how he or she would vote on another, even if it is the same kind of case. If the facts differ, it is a different case, and different pressures, feelings, and sympathies come into being. And, of course, facts do differ in each narcotics case; in each tax case; each personal injury case; and each case of any "type" or "kind."

Whether the United States District Attorney's staff in any district keeps a "jury book" or not (written or mental), whether it keeps a black-list of the few "sympathetic jurors," or a white list of the few "hanging jurors," cannot be considered error per se. Any group of attorneys associated together for any reason, who are constantly engaged in the trial of cases, will discuss and communicate as much information and knowledge as they possibly can to each other. Defense counsel, though perhaps not with the same enthusiasm, will discuss and relay information about jurors—"good" or "bad," as they may appear to interested partisans—just as the same information passes around with even greater frequency within the legal profession as to the judges themselves. In any jail

---

7. It lists some two hundred and fifty or three hundred jurors, one on each loose-leaf page. Of one juror it said: "This Juror very poor.—held up jury for 4 hours 11–1." On each of the other eleven jurors who had sat with this juror there appeared the notation that they had sat on this same jury that R........ had held up for four hours. (These were the "twelve times" referred to by the court below that a reference had been made in the book to an individual juror's action in the jury room.) A second juror "caused the jury to be hung several hours." The address and business, or the spouse's business, and the age of most jurors were given; how long they had lived in Southern California; their former place of residence; number of children, etc.

One juror was characterized as inattentive, another as having a hard time staying awake during later stages of trial; another juror listened carefully; "this juror slept during trial—was excused by the Court;" this juror was attentive to instructions; one was characterized as a strong juror for the government, another as "too sympathetic to boys in handcuffs;" another as an outstanding juror (after voting four times for conviction in government cases).

All other comments in the book had to do with juries as a whole—"excellent jury;" "good attentive jury;" "verdict in less than 20 min.;" "took 4 hours on simple case;" etc., "good jury, quick verdict."

or place of incarceration the "easy" and the "hard" judges are sought or evaded or avoided, if such be possible and any choice exists.

But, says appellant, the list here was more than mere reputation. It contains references to how the jurors voted. It must be conceded that with respect to the reference to two jurors having "held up" a jury for "four" or "several" hours, such notation purports to pass along information as to what happened within a jury room.

Again, as any jury trial lawyer knows, it is almost impossible to prevent eleven jurors who have been held from a decision for several hours by *one* who saw the matter the other way, from publicly expressing their displeasure or disgust. The proverbial request by the foreman of the hung jury "for eleven dinners and a bale of hay" is well known to all.

If counsel for this defendant had tried cases before some of the jurors on this panel and had received information or come to any conclusions with respect to their individual intelligence, attentiveness, or sympathetic attitude, he would have felt he was negligent toward his client's interest had he not utilized his knowledge, or his intuition, to his client's best advantage.

We are not impressed with the argument that under any and all circumstances, and irrespective of what may be in a jury book, its use should be declared to deprive a defendant of a fair jury trial. To carry such a theory to its ultimate and ridiculous conclusion, no defendant could be prosecuted by a government attorney who had more information about how jurors on that panel had voted, in other cases, than his own counsel had. If defense counsel chosen was trying his first case before that panel, must the government hire a lawyer who likewise has tried no cases before that same jury panel? Is a defendant, in the name of his constitutional rights, entitled to be prosecuted by a government prosecutor with no more experience than his own counsel, or vice versa? If so, how is such experience to be measured? If the government lawyer is a tyro, must a defendant replace his more experienced defense counsel? Such a proposed rule would break down law enforcement in this country. It cannot be seriously considered. Perfect equality in counsel can never be achieved, any more than there can be two judges, or groups of judges, with precisely similar competence.

We think that it is up to the individual judge to see that neither attorney has an unfair advantage over the other, whether by use of jury lists or jury books, or any other knowledge or information that exists with respect to a juror's previous action.

The remarks of the trial judge in this case, when the matter was brought to his attention, indicate a high sense of fairness to both sides. We conclude there was no error in his rulings in this case on the subject of the jury book's use.

We find no deprivation of the right to trial by jury as guaranteed by Art. III, § 2, clause 3, nor of any right to trial by an impartial jury as guaranteed by the Sixth Amendment.

## II. Prejudicial Misconduct of the Trial Judge

Appellant next asserts he did not have a fair trial because of the alleged prejudicial acts of the trial judge with reference to the testimony of one Edward Burton, who had previously been convicted of a narcotics offense and who testified against defendant with "expectation of leniency," and ultimately got it; that this witness had refused to answer certain questions on cross-examination after the court had "volunteered [a] bit of advice" that he need not answer questions with respect to where he had obtained narcotics in 1956 and previous years and to whom he had peddled narcotics in 1956 and previous years.

Appellant argues that the witness must assert the privilege—"that there is no duty upon the court to advise the defendant of his constitutional rights unless so requested"—that the court expressed an "overweening (sic) regard for this peddler of narcotics by exerting

itself to advise him that he could assert such a privilege." Relying on United States v. St. Pierre, 2 Cir., 1942, 132 F.2d 837; Tucker v. United States, 8 Cir., 1925, 5 F.2d 818.

■ We cannot think that counsel for defendant, in his zealous assertions of the constitutional rights of his clients, would urge that the trial court should not itself be zealous to protect the constitutional rights of any witness—even one so low as a convicted peddler of narcotics.

■■ Appellant does not rely on any specific rulings; he does "not here belabor the court with the extracts from the record." But he asserts that "collectively" they "deprived appellant of the right of a fair trial." Quercia v. United States, 1933, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321; United States v. Marzano, 2 Cir., 1945, 149 F.2d 923; United States v. Gross, 7 Cir., 1939, 103 F.2d 11; United States v. Breen, 2 Cir., 1938, 96 F.2d 782; Montrose Contracting Co. v. Westchester, 2 Cir., 1938, 94 F.2d 580; Williams v. United States, 9 Cir., 1937, 93 F.2d 685.[8]

We have read and re-read the direct (fifteen pages) and cross-examination (thirty-three pages) of Edward Burton, and each of the individual rulings[9] charged as collectively amounting to error. We find none, and hold there was no error.

### III. Illegal Search and Arrest

Appellant was arrested after officers had arranged to purchase heroin from Edward Burton and had given Burton $300 in bills powdered with fluorescent powder and from which the serial numbers had been taken. Edward Burton was observed going to appellant's home with the money, taking a trip in her car and returning to her home. Burton then delivered heroin to officer Harrington. Burton told the officers this heroin (established as such by a field test) had been purchased with the bills herein above described. Some of the bills were found on the person of Burton when he was arrested. The officers then arrested the appellant on the lawn of her home. She invited the officers in. More bills showing the written serial numbers were found when Mrs. Hamer, the appellant, opened her purse at the agents' request in her home and displayed its contents. Some $30 of the money from defendant's purse showed fluorescent under the "black-light" lamp used in Mrs. Hamer's house. The finger tips of Mrs. Hamer's right hand also fluoresced under the lamp.

Thereafter Mrs. Hamer's home was searched. In an unlocked 4' x 4' laundry room, in the rear yard, a white powder (later found to be heroin), an eye dropper, a needle and a spoon were found. Two white bindles containing heroin were found in the towel rack on the back porch.

■ Appellant urges that the arrest of defendant without a warrant was without probable cause and hence that the subsequent search of her home was unlawful.

"Probable cause exists where ' * * * "the facts and circumstances within their (the officers') knowledge and of which they had reasonable trustworthy information (are) sufficient in themselves to

---

8. Appellant does not raise here, nor did she raise or preserve below, the point that the invocation of the Fifth Amendment by a witness for the state may under some circumstances deprive defendant of the right to cross-examination as to relevant matters; or the converse proposition that a witness, by testifying on direct examination, may waive his right to claim the Fifth Amendment on cross-examination. Johnson v. United States, 1943, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704.

Our examination of the record indicates that the exercise of the claim of privilege by Burton on cross-examination did not deprive appellant of relevant cross-examination of any substance. In ruling on such matters, the discretion of the trial court is large. United States v. Toner, 3 Cir., 1949, 173 F.2d 140; Stephan v. United States, 6 Cir., 1943, 133 F.2d 87.

9. Tr. 85, 101, 102, 103–105, 106, 107, 116–118.

warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, quoting Carroll v. United States, supra, 267 U.S. [132] at page 162, 45 S.Ct. [280] at page 288 [69 L.Ed. 543]." Blackford v. United States, 9 Cir., 1957, 247 F.2d 745, 749.

We hold that under such facts hereinabove recited the officers in arresting the appellant had more than a mere suspicion to support that arrest—and did have probable cause. The present "reliability" of the alleged "unreliable" informer Burton had on September 24, 1956, been established by the fact that he had actually supplied heroin when previously asked to do so on September 11, 1956, when his actions and contacts were followed by the officers. Upon again supplying the narcotic to the officers on September 24, 1956, it would be reasonably probable that one of those persons Burton had contacted between 7:00 and 9:00 p. m. on September 11, 1956, and between 2:30 and 5:00 p. m. on September 24, 1956, would have supplied the heroin to Burton he on each occasion had obtained.

In our opinion the eye-witness testimony of officers Landry and Harrington, plus the heroin, the marked money taken from Burton, and what was said by him to the officers would have fully justified any magistrate in issuing a warrant for the arrest of defendant, or the issuance of a warrant for the search of her premises.

## IV. Error in Admission of Evidence

We find no error in permitting evidence in the record respecting the voluntary admission by defendant Hamer as to the person from whom she had purchased the narcotics, nor as to the court's ruling with respect to the police report of the incident.

## V. Insufficient Evidence

Counsel for appellant, by disregarding Burton's testimony, and certain physical evidence (such as the possession by his client of the numbered bills and her fluorescent fingers), urges us to conclude that the evidence was insufficient to sustain the conviction as a matter of law.

Such an argument is not worthy of the forceful position taken by appellant's counsel on other points previously discussed. Suffice it to say we find absolutely no merit in it.

The judgment of conviction is *affirmed* on both counts.