### CITY OF CHICAGO v. LE MOYNE.*

(Circuit Court of Appeals, Seventh Circuit. October 7, 1902.)

No. 734.

1. MUNICIPAL CORPORATIONS — STRUCTURES BUILT IN EXERCISE OF POLICE POWER—INJURY TO PRIVATE PROPERTY.

Under the provision of the Illinois constitution that "private property shall not be taken or damaged for the public use without just compensation," a city is not relieved from liability for damages caused to property by the construction of a viaduct in a street because it was built by the city in the exercise of its police power.

---

* Rehearing denied January 6, 1903.

2. SAME—LIABILITY FOR DAMAGES.

A city which caused the construction of a viaduct in a street cannot escape liability for damages caused to abutting property on the ground that the order under which it was built was void.

3. EVIDENCE—ADMISSIBILITY OF PLATS.

It is no objection to the admissibility in evidence of a plat made by a witness from a survey made by him, showing the location and surroundings of property for injury to which the action is brought, that it is not the best evidence, and that the official plat should be produced.

4. DAMAGES—INJURY TO PROPERTY BY OBSTRUCTION OF STREET.

In an action to recover damages for injury to property owned by plaintiff by reason of the construction of an embankment for approach to a viaduct upon a street on which some of the lots fronted, while others were separated from them by an alley and fronted on another street, it is competent to show that the value of the latter was affected by the embankment by preventing access to them from the street on which it was built, through the lots fronting thereon, where it was previously shown that all the lots were leased and used together as one tract, having a frontage on both streets.

5. SAME.

In an action to recover for an injury to property by the construction of a viaduct on the street upon which it fronted, benefits to the plaintiff in common with the public generally, resulting from the building of a street railway line on the street in consequence of the viaduct, cannot be shown to offset the actual damages caused by the viaduct, by preventing access to the property from the street.

6. SAME—EVIDENCE—DISCRETION OF COURT.

In such action a witness for defendant testified, without objection, that in his opinion the property could be so improved by the erection of buildings thereon to conform to the changed grade of the street that its value would not be lessened by the construction of the viaduct. Held, that the exclusion of a sketch made by the witness and offered in evidence to show the kind of building he would construct was within the discretion of the court, and, even if erroneous, was not prejudicial.

7. APPEAL—REVIEW—ERRORS NOT AFFECTING MERITS.

When it is manifest that a plaintiff is entitled to recover damages, and the amount awarded him is as small as it can reasonably be expected would be given by another jury, the judgment will not be reversed because of technical errors in procedure on the trial.

8. INSTRUCTIONS—TIME FOR PRESENTING REQUESTS.

The practice of presenting instructions to the court after the charge to the jury has been given cannot be sanctioned, and assignments of error based on the refusal to give such instructions will not be considered by the appellate court.

9. MUNICIPAL CORPORATIONS—ACTION FOR INJURY TO PROPERTY BY CONSTRUCTION OF VIADUCT—INSTRUCTIONS.

Instructions with respect to the measure of damages recoverable for an injury to property by reason of the construction of a viaduct on the street in front of it examined, and held free from material error.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

The defendant in error brought action against the city of Chicago for damage to his property occasioned by the construction of a viaduct in Halsted street, immediately adjacent to a portion of his premises. The block which contains the premises in question is bounded on the north by Thirty-Ninth street, on the east by Emerald avenue, on the south by Fortieth street, and on the west by South Halsted street. There is an alley running north and south through the center of the block. The block comprises 43 lots, numbered consecutively from 1 to 43, commencing at the corner of Thirty-Ninth street and Emerald avenue, except that lot 43 is situated at the southwest corner

of the block, and is bounded on the north by a 16-foot alley running east and west from Halsted street to the north and south alley. The lot is 44 feet in width on the north and south alley, and runs to a point on Halsted street. Le Moyne was the owner of lots 1 to 8, both inclusive, and of lots 14 to 22, both inclusive, all fronting on Emerald avenue; of lots 38 and 39, being the fourth and fifth lots south from the southeast corner of Halsted street and Thirty-Ninth street; and of lot 43, above described. Fortieth street had for years been occupied with 17 railway tracks of the Stockyards & Transit Company, which owned or occupied all the property on the west side of Halsted street from Thirty-Ninth street on the north to Forty-Seventh street on the south. Upon Halsted street was constructed and operated a street car line as far south as Fortieth street, and there was also a street car line on South Halsted street extending from the south side of Fortieth street, the street railway not crossing Fortieth street on account of the numerous railway tracks thereon, so that passengers traveling north and south over Fortieth street were obliged to do so on foot. The city caused to be constructed the viaduct in question for the purpose of uniting the two street railways, and to give them an overhead crossing, to avoid the dangerous grade crossing on Fortieth street. The viaduct required an elevation of the grade of Halsted street. This began a little north of Thirty-Ninth street, rising to the south. In front of lots 38 and 39 the elevation was 5.69 feet, and at lot 43, 18.29 feet, above the established grade. The viaduct was constructed under contract with the city, and under an order of the city passed January 6th, which was as follows:

"Whereas, by order of the city council, passed October 14, 1895, the department of public works was directed to notify the Chicago City Railway Company to run its cars on Halsted street, across the railroad tracks at Fortieth street, in order not to compel passengers to take transfers at that point and walk a block across the tracks; and by resolution of the city council of December 9, 1895, a committee was appointed to confer with the Chicago City Railway Company, in regard to the inadequacy of service in that portion of the city; and by order of the city council, passed December 23, 1895, the commissioner of public works was directed to compel the Chicago City Railway Company to run their cars on Halsted street, from O'Neil street to 69th street, without change of cars; and whereas, by order of the city council, passed September 22, 1890, the mayor and commissioner of public works were directed to confer with the Union Stock Yard and Transit Company to the end that some mutual agreement might be made for the construction of a viaduct over the stock yards tracks across Halsted street, between 39th and 40th streets; and in the report regarding the elevation of the tracks of the Union Stock Yard and Transit Company, submitted to the mayor by the consulting engineer of the city, under date of May 29, 1895, it is recommended that the elevation of such tracks commence east of Halsted street, and that a viaduct be constructed over the seventeen (17) tracks of that company, which pass out of the stock yards and occupy a length of some 350 feet in Halsted street, in order to obviate the great danger and delay at this grade crossing, which will be aggravated through the introduction of the electric cars of the Chicago City Railway Company on Halsted street, across these numerous railroad tracks:

"Ordered, that the mayor and commissioner of public works be, and they are hereby, directed to cause plans to be forthwith prepared for a viaduct, with suitable approaches, on Halsted street, over the tracks of the Union Stock Yard and Transit Company south of 39th street, and to let the necessary contracts for the construction of the same, upon obtaining from the Union Stock Yard and Transit Company and the Chicago City Railway Company, or either or both of said companies, an agreement to provide all moneys required to meet such contracts."

At that time lots 1 to 8, both inclusive, and lots 38 and 39, were occupied by one Donahue for the purpose of a coal yard, with its business frontage on Halsted street, under lease dated 1895, and expiring in 1906; and lots 14 to 22, both inclusive, and lot 43, were occupied by one Flannagan in a slaughtering and packing business, with an entrance on Halsted street and none upon Emerald avenue, under lease dated 1892, and expiring in 1902. The north

and south alley was either not known as such to the public, or was used in connection with and as part of the property. It had not in fact been open to the general use of the public, but had been built upon by the tenants of the property in question and of the other lots in the block.

The trial resulted in a verdict for the plaintiff below, and upon writ of error the city of Chicago brings the cause here for review. There are 73 assignments of errors in the record, which may be thus classified: 3 with regard to the refusal of the court to direct a verdict for the city; 35 with regard to the admission or exclusion of evidence; 23 with regard to the refusal of instructions requested by the city; 6 with regard to the charge of the court; and 4 with regard to the refusal to award a new trial for excessive damages, that the verdict was not sustained by the evidence, and for error in entering judgment upon the verdict. So far as deemed essential, these assignments are stated in the opinion.

Thomas J. Sutherland, for plaintiff in error.

Wey Frank Hamlin, for defendant in error.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

JENKINS, Circuit Judge (after stating the facts). The contention that the construction of the viaduct was in the legitimate exercise of the police power of the city, and that any damage to property thereby occasioned is damnum absque injuria, notwithstanding the constitutional provision that "private property shall not be taken or damaged for public use without just compensation," cannot be sustained. The question is set at rest by the recent decision of the supreme court of Illinois, in City of Chicago v. Jackson (as yet unreported officially) 63 N. E. 1013, holding, with Judge Dillon, that "a right conferred or protected by the constitution cannot be overthrown or impaired by any authority derived from the police power." Dill. Mun. Corp. (3d Ed.) § 142. So, also, the contention that the order of the city council of January 6, 1896, is void, and furnished no authority for the construction of the viaduct, is without support in law. The city, having caused the construction, must respond for the damages occasioned. It cannot shield itself under cloak of a void order. City of Chicago v. Spoor, 190 Ill. 340, 60 N. E. 540.

This brings us to the consideration of the many objections to evidence upon the trial, being 35 in number. It is to be remarked by way of preface that the bill of exceptions as presented is not conformable to the rule of this court. Rule 10, par. 2, 32 C. C. A. lxxxvii, 91 Fed. v, provides that a bill of exceptions "shall contain of the evidence only such a statement as is necessary for the presentation and decision of questions saved for review, and unless there be saved a question which requires the consideration of all the evidence, a bill of exceptions containing all the evidence shall not be allowed." The document submitted to our consideration is a stenographic report of all the proceedings of a trial continuing through five days. It embodies not only all the evidence, but all the arguments of counsel to the court, the remarks of the court, and colloquies between counsel; so that an unnecessary burden is imposed upon the court to search this voluminous record for the "two grains of wheat hid in two bushels of chaff." In the preparation of the bill the lawyer abdicated his function in favor of the stenographer. Such practice may be a saving of labor to counsel, but it is neither lawyer-

like nor just to the court or to client. This bill should never have been signed by the trial judge, and we would not be subject to just criticism if we declined to consider the errors assigned. We have concluded, however, to remark upon such of them as we think deserving of mention.

(1) The plaintiff below introduced a witness, who produced a plat made by him, which he stated was a correct plat of the property, showing its surroundings. The plat was made from an original survey by the witness. The lots placed upon the plat, and the figures of the dimensions of the lots, were obtained from the original plat on record in the recorder's office. The objection stated to the allowance of this plat in evidence is that it was not the best evidence, and that the original plat should have been produced. The objection is without merit. The object was to show to the jury the location of the property by the surveyor who had measured it. It would have been competent for him while upon the stand to have made a plat of the property as he found it for the inspection and information of the jury. Indeed, a similar plat of the property, with the lots and alleys projected upon it, had previously been offered in evidence and received without objection.

(2) In the cross-examination of the witness Woodruff he was called to testify to the character of the property and the use to which it was put and to the damage sustained. He was asked if access to South Halsted street in any way affected the value of the Emerald avenue lots. He had testified that Emerald avenue lots 1 to 8 had access to Halsted street through lots 38 and 39, and that those properties were used for a common purpose as one tract of land. He also testified that lots 14 to 22 had access to Halsted street through the alley north of lot 43, which property, with lot 43, was used for a common purpose. The objection to the question was that the owner was not interested in the traffic or ingress or egress on Halsted street. The objection is not well taken. The two properties, being thus used in common, had two frontages, one upon Emerald avenue and one upon Halsted street, and, if such access to the Emerald avenue lots gave value to the property, it was clearly competent to show it. The fact of the existence of the north and south alley intervening between the lots fronting on Emerald avenue and the lots fronting on Halsted street is not of moment, if the property be used for a common purpose. The existence of such alley aided rather than impeded such access. Access to the principal street could be had through the Halsted street lots or through the east and west alley.

It is also objected that the plaintiff in error was not permitted to prove upon the cross-examination of this witness that the market value of the property in question was not depreciated from other causes than the construction of the viaduct. We do not understand the court so to have ruled. The witness was being interrogated upon cross-examination whether the factories, breweries, and packing houses in the vicinity were not fronted upon Emerald avenue and not upon Halsted street, to which he gave an affirmative answer, and that they were built before the construction of the viaduct.

He added of his own motion that he did not know whether any other influences had worked upon the packing house business except the viaduct; that he did not know of any causes that had affected the business. The question was then propounded to him, "Or the value of that property?" to which there was objection. The counsel for the plaintiff below disclaimed damage for any reduction of the business carried on upon the property, and no evidence had been offered to show such decrease. The testimony of the witness was simply to the question of accessibility to the property, and the offer by the defendant at that time was to show the depreciation to business there occasioned by competition of the stock yards, and that the property of the plaintiff for packing house purposes had been injured from that cause. The question in the case was whether the construction of the viaduct had impaired, and to what extent, access to the property in question. The damages sought were for the impairment of that access, to whatever use the property might reasonably be put. The question was not proper by way of cross-examination, and it was irrelevant whether for packing house purposes the property was desirable by reason of the competition of great corporations. The defendant below was given full opportunity to prove the actual market value of the property before and after the construction of the viaduct, and has no right to complain of this ruling.

(3) It is objected that the trial court permitted testimony with respect to the traffic and business in connection with this property previous to the building of the viaduct. This contention is not sustained. The testimony went simply to the location and use of the property, and that the principal access thereto was from Halsted street. There was no claim by the plaintiff below for damage by reason of loss of business or diversion of traffic, nor any evidence offered in support of such claim. Much of the testimony which might seem to show diversion of traffic was brought out on cross-examination by the party now complaining of it; and the court was careful in its charge to inform the jury that "the diversion of trade from that particular locality by reason of better facilities being provided by the city for the public to reach other localities cannot be considered as an element of damage." And this instruction we understand to be in substantial accord with the doctrine declared in Hohmann v. City of Chicago, 140 Ill. 226, 29 N. E. 671.

(4) The defendant below propounded to a witness the question whether any advantage had resulted to the property in question by reason of the trolley system inaugurated on Halsted street subsequent to the building of the viaduct, through the increased facilities of access, and the question was excluded upon the ground that the benefit, if any, arising from the construction of the trolley system, was common to the neighborhood and could not be charged as a specific benefit to the land. This ruling, in our judgment, was clearly right. The supposed benefit sought to be proven was a general benefit to the community at large, within the doctrine of Railway Co. v. Stickney, 150 Ill. 362, 37 N. E. 1098, 26 L. R. A. 773, and Palmer Co. v. Ferrill, 17 Pick. 58. The supposed benefit of the trolley system did not arise directly and immediately from the building

of the viaduct; but, as is suggested in Palmer Co. v. Ferrill, from the application of capital, enterprise, and industry attracted thither by the establishment of the viaduct. The same consequences would ensue from the establishment of a trolley system without a viaduct. The fact that the viaduct induced the construction of the trolley system, because a railway crossing was thereby rendered safe which otherwise was dangerous, cannot convert the supposed general benefits to the community by reason of the establishment of the trolley system upon the street into a special benefit to the property in question, nor can they be offset against the actual damages accruing to the property by reason of nonaccess to the street caused by the viaduct. One may not be thus "improved out of his estate."

(5) A witness for the city undertook to show, and was permitted to testify, that the property in the changed condition of the street could be utilized by the construction thereon of flats and stores, adjusting the buildings to the changed condition of the street, and that thereby the value of the property would not have been injured. The witness stated that he had made a sketch, which he then produced, to show the appearance of the building which he would erect. It was a rough pencil sketch, intended merely for illustration. The sketch was offered in evidence and ruled out. It may have been well to have permitted the sketch to have gone in evidence, assuming that the testimony which was allowed without objection was admissible (Railroad Co. v. Blake, 116 Ill. 163, 4 N. E. 488; Springer v. City of Chicago, 135 Ill. 552, 26 N. E. 514, 12 L. R. A. 609), although the court in the Blake Case observed: "The practice, however, of introducing such evidence should not be encouraged, as there is generally more or less danger of its being misunderstood by the jury." The jury was possessed of the testimony of the witness touching the construction of the viaduct. The allowance of the exhibition of the plat to the jury was, we think, discretionary; but, at most, the ruling, if an error, was a harmless error.

We have thus considered such of the objections to testimony as we think it proper to mention. Undoubtedly the property was damaged by the construction of this viaduct. As the supreme court of Illinois observes in City of Chicago v. Jackson, supra: "No amount of expert evidence would be likely to ever convince any jury that this did not effect a damage to the property." In the case at bar the witnesses for the plaintiff below variously testified to the damage, the lowest estimate being $7,750, and the highest $12,980. The verdict was for but $2,500. It is not improbable that in a trial lasting through five days there was technical error in the procedure, but none, it may be said, whereby the real merits of the case were affected. However much the plaintiff below may have right to complain with respect to the amount of the verdict, it appears to us that the defendant below could have slight cause for complaint. And we quite agree with the remark of the supreme court of Illinois in the Jackson Case, that "where substantial justice has thus been accomplished through the trial, and where it seems obvious that no decision more favorable to the appellant would result from another

trial, it is not necessary, nor is it proper, that the judgment should be reversed because of the errors in procedure above indicated."

Coming, now, to the instructions requested to be given in charge to the jury, and to the charge itself and exceptions thereto: There were 23 instructions requested. These were presented to the court, as the record shows, after the charge to the jury had been delivered, and after the defendant below had presented its exceptions to the charge. Such practice cannot be sustained. Instructions should be presented to the court before the charge to the jury. This is not only due to the court, but is owing also to the rights of the parties litigant, and is in the public interest. The office of such request is to call the attention of the court to propositions of law supposed to affect the cause, that deliberation may be had thereon, and, if they be approved, incorporated in the charge of the court. It is unfair after the charge is delivered to press upon the court a whirlwind of requests to charge, possibly artfully contrived to entrap the court, and to require decision upon them without time for reflection. We have examined these instructions, and do not see that they raise any question material to the case that is not presented by the charge itself and by the exceptions thereto. We decline to discuss the question, because we are unwilling to sanction the practice here adopted and which we condemn. The charge itself is composed of 17 paragraphs upon different propositions with respect to the law and the evidence. It is thoroughly impartial upon the question of fact, and we need only consider it with respect to the law on the subject of damage, as the liability of the city for the damage occasioned, if any, has since the trial been determined, as we have before remarked, by the supreme court of Illinois.

The court carefully instructed the jury that the plaintiff below could not "in any manner or degree recover damages to the business of the lessees, or to the possession or occupation of the premises, during the term of the leases, but only the damages, if any, which had been occasioned to his reversionary interest in the property"; and the jury were cautioned to observe this distinction in weighing and considering the evidence of values and of damages which had been presented to them. We cannot comprehend the force of the objection to this part of the charge. With extreme care the rights of the defendant were protected in this respect, and the large difference between the amount of the verdict and the amount of the estimates of the witnesses for the plaintiff below makes clear that the caution of the court was not disregarded.

The court also charged that in estimating the damages, if any, accruing to the property in consequence of the construction of the viaduct, the diversion of trade from the particular locality by reason of better facilities being provided for the public to reach other localities, was not an element of damage, and should not be considered by the jury; and that it is only the special damage to particular property, as distinguished from damage to the public in general, by reason of the erection of this viaduct, which could be made the basis of an action; and this instruction seems to us to be correct.

The court also instructed the jury that the two alleys were public

alleys, and that the plaintiff had no right to the same different from the right of the public generally, and that the fact of their occupancy by the lessees to the exclusion of the public could add no value to the property. The jury were also charged, with respect to triangular lot 43, that if the plaintiff had the right of access to this lot from Halsted street by reason of the alley north of it, and that such access had been cut off by reason of the construction of the viaduct, and that thereby the lot had depreciated in its market value, such depreciation could be recovered. We see no objection to this charge or to the extension of it by the court to the Emerald avenue lots. There was no question in the trial that these alleys were public alleys. In the same breath counsel for the defendant below insists here that they were public alleys for the purpose of defeating the claim of the plaintiff as to the Emerald avenue lots, and that they were not public alleys for the purpose of defeating the claim of the plaintiff to lot 43. Whether the alleys were public or private, it is clear that access to these lots was actually had through them, and, if that access was cut off or impaired by the construction of the viaduct, the city would be responsible for the damage resulting.

The court also instructed the jury that no consideration should be given to any evidence of the benefit to the property by reason of the construction and operation of any street railway in that vicinity, but the benefits to be considered were such as are solely and strictly due to the construction of the viaduct, and upon that accruing especially to the plaintiff's reversionary interest in the property different from the benefits which may have accrued to the public generally "or to all the other property in that particular neighborhood." Possibly this latter expression may not be in exact accord with the ruling in Railway Co. v. Stickney, 150 Ill. 362, 37 N. E. 1098, 26 L. R. A. 773; and probably, if the court's attention had at the time been called to the expression, the instruction would have been modified. The exception to the charge, however,—which was manifestly prepared subsequently to the verdict, although incorporated in the bill of exceptions as made at the time,—is to the entire clause, and not to the particular part now complained of, and the rule is elementary that, if the clause of the charge excepted to embodies both correct and erroneous instructions and the exception be general, it cannot be sustained. The court here properly charged that the damage to this property could not be reduced by any supposed benefit growing out of the construction and operation of a street railway upon it. The city could not diminish the amount of the wrong it wrought by the benefit that some other corporation might give to the property. We are therefore not required to consider whether this particular clause in the charge is or is not erroneous.

It may be said that, with the exception of the alleged benefit from the construction of the trolley line, no element of benefit was kept from the jury. The sole claim for damage was the cutting off of access to the property. The benefit claimed, aside from that mentioned, was the doing away of a dangerous grade crossing, and evidence in that respect was admitted without question.

We have carefully scrutinized this charge and as well the instruc-

tions requested, to ascertain if any substantial right had been denied the city of Chicago, and if any error had intervened to its substantial detriment, and we can find none. There was a prolonged trial, resulting in a conservative verdict, which we are not disposed to disturb, and which the public interest requires we should not disturb for any error not affecting the substantial merits of the cause.

The judgment is affirmed.