## HEWITT v. UNITED STATES.
### No. 11388.

Circuit Court of Appeals, Eighth Circuit.
March 5, 1940.

Rehearing Denied March. 23, 1940.

Writ of Certiorari Denied May 27, 1940.

See 60 S.Ct. 1089, 84 L.Ed. ——.

**4**

Ira B. McLaughlin, of Kansas City, Mo., for appellant.

Richard K. Phelps, Asst. U. S. Atty., of Kansas City, Mo. (Maurice M. Milligan, U. S. Atty., of Kansas City, Mo., on the brief), for appellee.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

The University Bank of Kansas City, Missouri, on the morning of June 30, 1937, was robbed by armed men who stole $3,-955.71 of its funds. It was a State bank and its deposits were insured by the Federal Deposit Insurance Corporation of the United States. For that reason, the United States was interested. By an indictment in two counts the United States charged James Harris, George Karatasos, William Newell, Orville Chester Garrison, Charlie Norvel Arthur and Paul M. Hewitt with having committed this robbery. The defendants other than Hewitt were all convicted either upon pleas of guilty or after trial. Hewitt had left the Western District of Missouri shortly after the robbery and was not arrested and arraigned until after his co-defendants had been sentenced. Upon his arraignment he entered a plea of not guilty and was thereafter tried, convicted and sentenced, and has now appealed.

The alleged errors upon which the defendant Hewitt relies for a reversal relate to (1) the indictment, (2) the order fixing bail, (3) the denial of his motion for a bill of particulars, (4) the denial of his motion for a continuance, (5) rulings upon evidence, (6) the court's instructions to the jury, and (7) the sentence.

The sufficiency of the evidence to sustain the conviction is not challenged. Two of Hewitt's co-defendants, Karatasos and Newell, were witnesses against him. Their testimony was to the effect that, while Hewitt was not personally present when the robbery was committed, he had suggested, planned and financed it, had supplied the automobiles and one of the guns used in connection with its commission, had shared in the loot, and had endeavored to assist his co-defendants to escape the consequences of their crime. They testified that Hewitt had given assurances to the actual participants that the robbery could be committed· without fear of burglar alarms or of the local police. Assuming that the facts· were as the government's evidence indicated them to be, the guilt of the defendant Hewitt was proved beyond the possibility of any doubt.

We consider the questions presented in their order.

The Indictment.

The indictment is based upon Section 588b, Title 12, U.S.C., 12 U.S.C.A. § 588b, which on June 30, 1937, provided:

"(a) Whoever, by force and violence, or by putting in fear, feloniously takes, or feloniously attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

"(b) Whoever, in committing, or in attempting to commit, any offense defined in subsection (a) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon ·or device, shall be fined not less than $1,-000 nor more than $10,000 or imprisoned not less than five years nor more than twenty-five years, or both."

Section 588a, Title 12, U.S.C., 12 U.S.C.A. § 588a, provides that the term "bank" as used in Section 588b, 12 U.S.C.A. § 588 b, includes "any insured bank as defined in subsection (c) of section 264 of this title." Subsection (c) (8) of Section 264, 12 U.S.C.A., provides: "The term 'insured bank' means any bank the deposits of which are insured in accordance with the provisions of this section; * * *." Section 264

creates the Federal Deposit Insurance Corporation to insure "the deposits of all banks which are entitled to the benefits of insurance under this section." Every operating State or national bank which was a member of the Federal Reserve System at the time the section was enacted became automatically an insured bank. § 264(e). Every bank not a member of the Federal Reserve System, which on June 30, 1935, was or thereafter became "a member of the Temporary Federal Deposit Insurance Fund or of the Fund for Mutuals heretofore created pursuant to the provisions of this section," also became automatically an insured bank. § 264(f).

The government in the indictment undertook to charge the defendants in count one with having forcibly robbed the University Bank, a State bank the deposits of which were insured by the Federal Deposit Insurance Corporation of the United States, and in count two with having, while committing the robbery, put the lives of persons in jeopardy by the use of dangerous weapons. The indictment was defective in that in the first count the bank was alleged to be "a member of the Federal Deposit Insurance Corporation of the United States", and in the second count was alleged to be "a member of the F.D.I.C. of the United States." The indictment should have alleged in each count that the bank was a State bank the deposits of which were insured by the Federal Deposit Insurance Corporation of the United States. It is the defendant's contention that these defects in the indictment were fatal and that the demurrer to the indictment should have been sustained. The government argues that the defects were to be regarded as formal and technical and nonprejudicial. § 556, Tit. 18, U.S.C., 18 U.S.C.A. § 556.

Speaking with precision, the Federal Deposit Insurance Corporation has no members. It has stockholders (United States and Federal Reserve Banks), § 264(d) and it has insureds, § 264(e) and (f). In practical effect it is a mutual insurance company set up by the government, to be supported by assessments levied upon insured banks. § 264(h). The insured banks may be regarded as members of this insurance corporation in much the same way and to much the same extent as persons insured in a fraternal benefit society or in a mutual insurance company are considered and commonly referred to as members of those organizations. The banks are members of the Federal Deposit Insurance Corporation in the sense that their deposits are insured therein and that they are liable for assessments, and that through the medium of the corporation they furnish each other's depositors protection against losses. As a practical matter, no one was, and no one could have been, in any doubt as to what the government meant by the allegation in the indictment that the bank was a member of the Federal Deposit Insurance Corporation. The defendant was in no doubt as to the nature of the charge that was made against him. In his motion for a bill of particulars, made in advance of the trial, he stated "that it is attempted to charge this defendant in both counts of the indictment found and filed herein with the crime and offense of bank robbery, said charge being based upon 12 U.S.C.A. § 588b, to which indictment, if the same be ruled sufficient, this defendant will plead not guilty."

That the bank was insured by the Federal Deposit Insurance Corporation was, of course, an essential element of the offenses sought to be charged.[1] The complete omission of any allegation which might reasonably be construed to mean that the bank was so insured would be fatal under the rule announced by this Court in Shaw v. United States, 292 F. 339. If, however, the allegation that the bank was a member of the Federal Deposit Insurance Corporation may be taken to mean what it was intended to mean, and what everyone, including the defendant, understood that it was intended to mean, then it was merely a loose and inartificial form of alleging that the bank was an "insured bank", and this defective averment would not render the indictment invalid, where no actual prejudice resulted.

"The rigor of old common-law rules of criminal pleading has yielded, in modern practice, to the general principle that formal defects, not prejudicial, will be disregarded. The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain,

[1] Shaw v. United States, 8 Cir., 292 F. 339, 344, and cases cited; Davidson v. United States, 8 Cir., 61 F.2d 250, 255, 256; Cox v. United States, 8 Cir., 96 F.2d 41, 43; McNally v. Hill, 3 Cir., 69 F.2d 38, 40; United States v. Minnec, 7 Cir., 104 F.2d 575, 577; Harris v. United States, 8 Cir., 104 F.2d 41, 43, 44, and cases cited.

but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' Cochran and Sayre v. United States, 157 U.S. 286, 290, 15 S.Ct. 628, 630, 39 L.Ed. 704; Rosen v. United States, 161 U.S. 29, 34, 16 S.Ct. 434, 480, 40 L.Ed. 606.

 "Section 1025, Revised Statutes (U.S.C., title 18, § 556, 18 U.S.C.A. § 556) provides:

" 'No indictment found and presented by a grand jury in any district or other court of the United States shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant.'

"This section was enacted to the end that, while the accused must be afforded full protection, the guilty shall not escape through mere imperfections of pleading. * * *

"It, of course, is not the intent of section 1025 to dispense with the rule which requires that the essential elements of an offense must be alleged; but it authorizes the courts to disregard merely loose or inartificial forms of averment." Hagner v. United States, 285 U.S. 427, 431, 432, 433, 52 S.Ct. 417, 419, 76 L.Ed. 861.

 The sufficiency of an indictment should be judged by practical, and not by technical, considerations. It is nothing but the formal charge upon which an accused is brought to trial. An indictment which fairly informs the accused of the charge which he is required to meet and which is sufficiently specific to avoid the danger of his again being prosecuted for the same offense should be held good.[2]

 It is our opinion that the indictment in suit omitted no essential element of the offenses sought to be charged, but that an essential element was imperfectly, inartificially and loosely stated.

 The contention that the designation of the Federal Deposit Insurance Corporation in the second count by its initials "F.D.I.C." rendered that count fatally defective, is, we think, without merit. It was poor pleading, but the meaning of the letters "F.D.I.C." when read in the light of the context and of the entire indictment, was obvious and did not mislead. See Bell v. United States, 5 Cir., 100 F.2d 474, 477, and cases cited; United States v. Reichert, C.C., 32 F. 142.

 The defendant also contends that there was an insufficient allegation in the second count of the indictment that lives were put in jeopardy by the use of dangerous weapons. The indictment charges in effect that the defendants pointed loaded guns at certain designated officers and employees of the bank and thereby put their lives in jeopardy. This, we think, was sufficient.

### Bail.

 The defendant contends that the court fixed bail in an excessive amount. The ruling of the court below upon the application for bail was not a ruling made during the trial, and the application for bail was no part of the trial. See Ewing v. United States, 6 Cir., 240 F. 241, 252–254. Orders fixing bail are reviewable, but not upon an appeal from a judgment of conviction.[3]

---

[2] Claiborne v. United States, 8 Cir., 77 F.2d 682, 689; Horn v. United States, 8 Cir., 182 F. 721, 728; Davis v. United States, 4 Cir., 49 F.2d 267; Beard v. United States, 65 App.D.C. 231, 82 F.2d 837, 840; Stumbo v. United States, 6 Cir., 90 F.2d 828, 831, 832, and cases cited; Eslick v. United States, 6 Cir., 76 F.2d 706, 707; Hill v. United States, 7 Cir., 275 F. 187, 189; Grandi v. United States, 6 Cir., 262 F. 123, 124; United States v. Drexel, 2 Cir., 56 F.2d 588, 589; Hass v. United States, 8 Cir., 93 F.2d 427, 429, and cases cited; United States v. Minnec, 7 Cir., 104 F.2d 575, 577.

[3] See, in this connection: 8 C.J.S., Bail, pages 96–107, §§ 48–51; Hudson v. Parker, 156 U.S. 277, 15 S.Ct. 450, 39 L.Ed. 424; Kitrell v. United States, 10 Cir., 76 F.2d 333; Moder v. United States, 61 App.D.C. 300, 62 F.2d 462; Connley v. United States, 9 Cir., 41 F.2d 49; Lewis v. United States, 8 Cir., 14 F.2d 111; Jones v. United States, 4 Cir., 12 F.2d 708; Rossi v. United States, 8 Cir., 11 F.2d 264; United States v. Motlow, 7 Cir., 10 F.2d 657; In re Williams, 54 App.D.C. 65, 294 F. 996; Ex parte Bollman (Ex parte Swartwout), 4 Cranch. 75, 2 L.Ed. 554; 8 C.J.S., Bail, page 93, § 46.

### Denial of Defendant's Motion for Bill of Particulars.

It was not claimed by the government that the defendant was present when the robbery was committed. The claim was that he knowingly aided the actual perpetrators of the robbery. In advance of trial, the defendant moved for a bill of particulars which would inform him of the acts or words which the government claimed constituted the basis for the charge that he had aided in the commission of the robbery, together with the time, place and persons present when and where the acts were committed or the words said. The record does not contain the arguments which were made upon the hearing of the motion. The record shows that the defendant then had in his possession a transcript of the testimony adduced at the trial of Orville Garrison, a co-defendant, who had been tried in November, 1937, and that this transcript showed that the co-defendant Karatasos had testfiied that Hewitt had assisted in planning the robbery and that "on or about the 24th day of June, 1937" all of the defendants met at Hewitt's place of business in Kansas City, Missouri, and discussed the proposed robbery of the bank. Upon the assumption that the defendant Hewitt had obtained from the transcript of the evidence given at the trial of Garrison all the information with respect to the charge which he needed in order to prepare himself for trial, the court denied the motion for a bill of particulars.

 The rule is that if a defendant is not sufficiently informed by an indictment of the nature and cause of the accusation made against him and is fearful that upon trial he will be surprised by the evidence of the government, he can apply for a bill of particulars, which the trial court, in the exercise of a sound legal discretion, may grant or refuse, as the ends of justice require.[4] It necessarily follows that a clear abuse of judicial discretion in denying an application for a bill of particulars must be shown in order to justify a reversal. Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545. There was no such abuse of discretion shown in this case. The only basis for the present claim that the court abused its discretion is the fact that, upon the trial of Hewitt, Karatasos testified that the defendants met at Hewitt's place of business on the night of June 28, 1937, instead of testifying, as he had at the trial of Garrison, that the meeting took place "on or about the 24th day of June, 1937"; and the fact that Hewitt was unable to recall or to show where he was on the night of the 28th of June. The importance of the evidence tending to show that a meeting of all the defendants occurred on June 28, 1937, we think has been greatly exaggerated. It was merely one item of evidence tending to show that Hewitt had associated himself with the other defendants in aid of the commission of the robbery.

### Denial of Motion for Continuance.

 Counsel for the government in his opening statement to the jury said that the evidence would show that Hewitt met with the other defendants at his place of business on the night of June 28, 1937. Thereupon the defendant Hewitt moved the court to discharge the jury and to continue the case in order that he might properly prepare his defense, claiming that he was surprised and had been led to believe that the government's evidence would show that this meeting occurred on or about June 24, 1937; that he was prepared to defend against the charge that he had participated in such a meeting on any date between the 24th and the 27th, but had not prepared himself to meet the charge that the meeting had taken place on the 28th, and was therefore not able to defend himself. The court denied his motion to discharge the jury and continue the cause. The motion was addressed to the discretion of the trial court.[5] The trial was certain

[4] Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545; Rosen v. United States, 161 U.S. 29, 35, 40, 16 S.Ct. 434, 40 L.Ed. 606; Cochran v. United States, 8 Cir., 41 F.2d 193, 198; Chew v. United States, 8 Cir., 9 F.2d 348, 353; Rimmerman v. United States, 8 Cir., 186 F. 307, 310; Rinker v. United States, 8 Cir., 151 F. 755, 759; Robinson v. United States, 9 Cir., 33 F.2d 238, 240; Salerno v. United States, 8 Cir., 61 F.2d 419, 421; Goldstein v. United States, 8 Cir., 63 F.2d 609, 612; Mulloney v. United States, 1 Cir., 79 F.2d 566, 572; Stumbo v. United States, 6 Cir., 90 F.2d 828, 832; Landay v. United States, 6 Cir., 108 F.2d 698, 703.

[5] Fidelity & Deposit Co. v. L. Bucki & Son Lumber Co., 189 U.S. 135, 143, 23 S.Ct. 582, 47 L.Ed. 744; Hardy v. United States, 186 U.S. 224, 22 S.Ct. 889, 46 L.Ed. 1137; Goldsby v. United States, 160 U.S. 70, 72, 16 S.Ct. 216, 40 L.Ed. 343; Isaacs v. United States, 159 U.S.

to continue for a number of days. It lasted for more than a week. No assurance was given to the court by the defendant or by his counsel that if a continuance was granted it would benefit the defendant in any way. The defendant did not ask for a suspension of the trial for any specific interval. He made no showing which would justify the court in believing that if the trial was postponed he could procure evidence to controvert the testimony of the government with respect to a meeting of all of the defendants being held on June 28th, or that any such evidence was in existence. In testifying upon his own behalf, as the trial was nearing its end, Hewitt said, "I don't know where I was the night of June 28th, 1937." The court was under no obligation to continue the case indefinitely in the hope or expectation that Hewitt might recall where he was on that night. In the absence of any showing that a continuance would enable Hewitt to better defend himself against the charge that he aided in the commission of the robbery, we think the court did not err in denying his motion.

### Rulings on Evidence.

■ It is argued that the court erred in permitting the government to prove that the University Bank was an insured bank, because that fact was not within the issues made by the pleadings. In view of our ruling that the indictment sufficiently charged that the bank was an "insured bank", there is now no merit in this contention.

■ It is also argued that the court erred in rejecting a marked map which was used in the cross-examination of Newell, who testified against Hewitt. This map was merely illustrative of Newell's testimony as to the location of a cottage near Lake Taneycomo, which, after the commission of the robbery and on July 7, 1937, was, according to Newell's evidence, occupied by Garrison, Newell and their women companions. The map added little or nothing to the testimony which Newell gave upon his cross-examination, and the question whether it should be received in evidence rested in the discretion of the trial court.[6]

■ It is next contended that the court erred in rejecting the offer of the defendant to prove by an expert boatman that outboard motors frequently stop or stall when hot, and start readily after they have cooled off. This testimony was offered for the purpose of substantiating testimony given by Hewitt to the effect that on July 7, 1937, he was forced to land on the shores of Lake Taneycomo. The government's evidence showed that on that day Hewitt and a Mr. Dailey had arrived at the Lake by airplane and that Hewitt used a boat with an outboard motor for the purpose of visiting the cottage, not far from the Lake, where Garrison and Newell were staying. It is so clear that no sufficient foundation was laid for the introduction of this expert testimony that there is no point in discussing the situation in detail. Hewitt did not testify that the outboard motor was overheated. He said that he used the boat until the motor stopped, and that he then pulled it up on shore, looked the motor over, and could not determine what was wrong and so left the boat and then walked back to Rockaway Beach, the point on the Lake where he had left Dailey, who had accompanied him in the airplane. To enable any expert to properly diagnose Hewitt's difficulty, if any, with the outboard motor, more information than was disclosed by the evidence in this record would be essential.

It is further contended that the court permitted the government in its cross-examination of Hewitt to go too far afield and to inquire with reference to matters wholly disconnected with the offense charged against him.

487, 489, 16 S.Ct. 51, 40 L.Ed. 229; United States v. De Armond, 8 Cir., 48 F.2d 465, 466; McLaughlin v. United States, 8 Cir., 84 F.2d 561, 562; Paschen v. United States, 7 Cir., 70 F.2d 491, 494; Wilson v. Lanagan, 1 Cir., 99 F.2d 544, 546; George v. Wiseman, 10 Cir., 98 F.2d 923, 928; Tomlinson v. United States, 68 App.D.C. 106, 93 F.2d 652, 656, 114 A.L.R. 1315; Ginsberg v. United States, 5 Cir., 96 F.2d 433, 436; Centoni v. United States, 9 Cir., 69 F.2d 624, 625; Dundee Petroleum Co. v. Clay, 8 Cir., 267 F. 145, 150; Armour & Co. v.

Kollmeyer, 8 Cir., 161 F. 78, 80, 16 L.R.A.,N.S., 1110; Drexel v. True, 8 Cir., 74 F. 12, 13; 12 Am.Jur. 449–450.

6 22 C.J. 910, § 1114; City of Chicago v. Le Moyne, 7 Cir., 119 F. 662, 668; Turner v. United States, 5 Cir., 66 F. 280, 282; Chicago G. W. R. Co. v. Robinson, 8 Cir., 101 F.2d 994; United States v. Park Avenue Pharmacy, Inc., 2 Cir., 56 F.2d 753, 756; Benway v. People of Michigan, 6 Cir., 26 F.2d 168, 169, 170; West v. United States, 8 Cir., 15 F.2d 916, 917.

■ The scope of cross-examination rests in the sound discretion of the trial judge.[7]

■ The cross-examination complained of related to a transaction which took place at the time Jean Sirna, a companion of Newell and Garrison, had returned to Hewitt one of the cars which the government's evidence showed was used in connection with the "get-away" after the robbery. The evidence was that when this car was returned to Hewitt, he assisted Jean Sirna in procuring a DeSoto car for her use and that of the defendants Newell and Garrison. This evidence bearing upon Hewitt's participation in the purchase of the DeSoto car which was substituted for the car which he was alleged to have furnished, and upon his dealings with the seller of the DeSoto, was, we think, admissible; but, even if we were mistaken as to that, this cross-examination would not justify a reversal.[8]

### The Court's Instructions to the Jury.

■ The court did not err in denying the defendant's request that the jury be instructed that there was no evidence that the University Bank was a member of the Federal Deposit Insurance Corporation, since the fact that it was an "insured bank" had been established by competent evidence.

The court charged the jury as follows: "If you find and believe from the evidence in this case that the defendant, with others, on the 30th of June, 1937, robbed the University State Bank of Kansas City, located at 316 West 63rd Street and that it was a member of the Deposit Insurance Corporation, and on that question, gentlemen, there can be no room for inquiry about that—that is a law question, so I think it is my duty to instruct you that as

a matter of law it was a member of the Federal Deposit Insurance Corporation. If you have any view different from that, of course, you could have no power in law. It was a member so I do instruct you as a matter of law that it was." No exception was taken by the defendant to this instruction, but he now contends that the error of the court in so charging the jury was so plain and vital that this Court should reverse in order to prevent a miscarriage of justice.

■ The rule is that an error in the charge is not reviewable in the absence of an exception directing the attention of the trial court to the alleged mistake with sufficient definiteness to enable it to correct it.[9]

■ If the instruction complained of had related to a fact which was in actual controversy, there would be much force in the defendant's contention that this Court should take notice of it regardless of the fact that it was not excepted to. It is obvious, however, that, while in a technical sense the allegation that the bank was an insured bank was controverted, in a practical sense there was no controversy about the matter whatsoever. That the bank was insured and that it had been robbed was not, and is not now, in dispute. The government contended that Hewitt was an aider and abettor. He contended that he was not. That presented the real issue. To send this case back for a retrial because the court (probably inadvertently) stated to the jury that as a matter of law the bank was a member of the Federal Deposit Insurance Corporation, could not, from a practical standpoint, be justified.[10]

■ The defendant complains of the following instruction: "Now, I may say there, from your examination of these wit-

[7] District of Columbia v. Clawans, 300 U.S. 617, 632, 57 S.Ct. 660, 81 L.Ed. 843; Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624; Blitz v. United States, 153 U.S. 308, 312, 14 S.Ct. 924, 38 L.Ed. 725; Storm v. United States, 94 U.S. 76, 85, 24 L.Ed. 42; Rea v. Missouri, 84 U.S., 17 Wall. 532, 542, 543, 21 L.Ed. 707; Shama v. United States, 8 Cir., 94 F.2d 1, 5; Hartzell v. United States, 8 Cir., 72 F. 2d 569, 585; Heard v. United States, 8 Cir., 255 F. 829, 832.

[8] See and compare Holmes v. Goldsmith, 147 U.S. 150, 164, 13 S.Ct. 288, 37 L.Ed. 118; Miller v. United States, 8 Cir., 21 F.2d 32, 36; Williams v. United

States, 8 Cir., 265 F. 625; Salerno v. United States, 8 Cir., 61 F.2d 419, 424; Hartzell v. United States, 8 Cir., 72 F. 2d 569, 580, 585; Morgan v. United States, 8 Cir., 98 F.2d 473, 477.

[9] Diehl v. United States, 8 Cir., 98 F. 2d 545, 547; Muench v. United States, 8 Cir., 96 F.2d 332, 336; Walker v. United States, 8 Cir., 93 F.2d 383, 394; Hall v. Ætna Life Ins. Co., 8 Cir., 85 F.2d 447, 450; Wilson v. United States, 8 Cir., 77 F.2d 236, 238; Busch v. United States, 8 Cir., 52 F.2d 79, 87.

[10] See and compare Horning v. District of Columbia, 254 U.S. 135, 137, 138, 41 S.Ct. 53, 65 L.Ed. 185; Rich v. United States, 8 Cir., 271 F. 566, 569.

nesses and listening to them, if you believe what they said about that, then that ends the case because if he did what they said he did then, of course, obviously, he is guilty and the jury should promptly return a verdict. It becomes your duty to look into their faces and determine whether or not they told the truth about it and if you believe that they did tell the truth, then, as I say, that is the end of the lawsuit. In other words, there is nothing further for you to consider because if they told the truth about it, then the defendant is guilty."

It is contended that in giving this instruction the court invaded the province of the jury and virtually directed a verdict. Attention is directed to the case of Dinger v. United States, 8 Cir., 28 F.2d 548. That case is not in point. There the defendant had not taken the stand, and the only evidence in the case was that of the government. This Court, in the Dinger case, construed the charge of the lower court as directing the jury to believe the government witnesses and then instructing them that if they did believe the government witnesses they must find the defendant guilty.

The instruction challenged by the defendant did nothing more than advise the jury that if they found the facts to be as testified to by the government's witnesses, the defendant was guilty under the law. That was an accurate and correct statement, and was entirely justified. It did not invade the province of the jury. The credibility of the witnesses and the weight of evidence was left to the jury's determination. Compare Horning v. District of Columbia, 254 U.S. 135, 137, 138, 41 S.Ct. 53, 65 L.Ed. 185.

■ It is next contended that the court's supplemental charge to the jury, urging the jurors to agree, if possible, was error. Among other things, the court said: "The court is of the opinion that the case cannot be again tried better or more exhaustively than it has been tried on either side. It is, therefore, very desirable that you should agree upon a verdict. * * * You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be, and there is no reason to suppose that the case will ever be submitted to twelve men more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on one side or the other." The defendant's claim

is that, as applied to the facts of this case, this portion of the supplemental charge was inappropriate and erroneous because it gave the jury to understand that it was of no consequence that the government's evidence showed that the date of the alleged meeting between all of the defendants at Hewitt's place of business occurred on the 28th of June instead of on or about the 24th, and that (in some way not readily apparent) this deprived the defendant of his presumption of innocence. There was, as a matter of fact, in the record no basis for supposing that upon a new trial either side would have been able to produce more or clearer evidence. It was the duty of the jury to decide the case upon the evidence that had been produced, and, even if it had believed that upon another trial the defendant might or could produce better evidence, that would have constituted no justification or excuse for a disagreement. Taking the court's supplemental charge as a whole, it amounted to nothing more than a request to the jury to agree upon a verdict if they could conscientiously do so, and was as fair to the defendant as it was to the government.

### The Sentence.

The defendant contends that the court erred in imposing a sentence under each count, to be served consecutively, and that no sentence should have been imposed upon the first count, since the robbery of the bank did not constitute two separate crimes for the purposes of punishment.

■ "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether *each* provision requires proof of an additional fact which the other does not. [Emphasis supplied.] Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489, and authorities cited." Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 70 L.Ed. 306; Casebeer v. United States, 10 Cir., 87 F.2d 668, 669. In United States v. Harris, D.C., 26 F. Supp. 788, it was held that Section 588b of Title 12, U.S.C., 12 U.S.C.A. § 588b, creates two separate and distinct offenses, and that therefore one robbery of one bank if accompanied by assault or by putting life in jeopardy constitutes separate offenses. It is said in that case (speaking of the two offenses defined in Section 588b) 26 F. Supp. at page 792: "It is true, they both

have one common element,—robbery. But in one the robbery is accompanied simply by force; in the other, it is accompanied by an assault which endangers the life of a person, by the use of a deadly weapon. They call for different proof. So that under the plea of guilty here, the Court would have been justified in imposing a separate sentence on each, and allowing them to run consecutively." This seems to overlook the fact that the same proof which establishes the second will prove the first.

The Circuit Court of Appeals of the Fifth Circuit has reached a contrary conclusion in Durrett v. United States, 107 F. 2d 438. In that case the court said, 107 F. 2d at page 439: "Reduced to its simplest terms, the statute says that whoever feloniously attempts to take shall be punished by a fine not to exceed $5,000 or imprisonment not to exceed twenty years, or both; but if in the attempt a dangerous weapon or device is used to place in jeopardy the life of any person, then the fine shall be not less than $1,000 nor more than $10,000, and the imprisonment shall be not less than five years nor more than twenty-five years. It follows that the facts as alleged in counts two, three, and four show the commission of only one offense, for which only one sentence may be imposed."

The Circuit Court of Appeals of the Tenth Circuit had, by implication, in Casebeer v. United States, 87 F.2d 668, apparently arrived at the same conclusion as was later reached by the Fifth Circuit. The contention in that case was that the indictment which charged the offense defined in Section 588c of Title 12, U.S.C., 12 U.S.C. A. § 588c (bank robbery accompanied by killing or kidnapping), covered the offenses defined in Section 588b as well, and was therefore duplicitous. The court held to the contrary, saying, 87 F.2d at page 669: "The indictment charges all of the several elements that make up the offense defined in section 588c. It does not charge any of the offenses defined in section 588b merely because it is broad enough to include them since by including the additional element of the offense defined in section 588c it shows it is predicated on that section and is intended to charge only the offense defined therein. It is not duplicitous."

We think that the conclusion reached by the Fifth Circuit in the case of Durrett v. United States, supra, is correct. Congress, in enacting Sections 588b and 588c, was dealing with the crime of bank robbery, and not with forcible taking, putting in fear, assault, putting lives in jeopardy, killing and kidnapping as distinct crimes. In effect, Congress created three classes of bank robbery according to degree; first, that which was accompanied by force or putting in fear; second, that which was accompanied by assault or putting lives in jeopardy; and, third, that which was accompanied by killing or kidnapping. Proof of robbery of the second class would also prove robbery of the first class, and proof of robbery of the third class would prove robbery of both the first and the second classes.

Our conclusion is that the robbery of the University Bank constituted, for the purpose of sentence, but one offense, and that no sentence should have been imposed under the first count of the indictment.

The sentence of twenty years imposed under count one will be vacated. The judgment and the sentence of twenty-five years imposed under count two is affirmed.