**ILLINOIS TERMINAL R. CO. v. CREEK.**

**No. 14864.**

United States Court of Appeals Eighth Circuit.

Oct. 30, 1953.

Wayne Ely, St. Louis, Mo. (Joseph L. Badaracco, Robert C. Ely and Ely & Ely, St. Louis, Mo., on the brief), for appellant.

Charles E. Gray, St. Louis, Mo. (Phillip B. Sachs, Clayton, Mo., and Inman, Dyer, Gray & Dreher, St. Louis, Mo., on the brief), for appellee.

Before SANBORN and THOMAS, Circuit Judges, and HULEN, District Judge.

SANBORN, Circuit Judge.

David Wayne Creek, a nine year old boy, on April 24, 1951, while trespassing on the right-of-way of the Illinois Terminal Railroad Company, in the subway under Twelfth Street, in St. Louis, Mis-

souri, ran head on into the side of a moving electric passenger streetcar of the Company and was seriously injured. He brought this action to recover damages for his injuries, in reliance upon the Missouri humanitarian rule of negligence. He asserted, in substance, that the operator of the electric car, after observing the plaintiff (appellee) in a position of imminent peril, failed to use due care to avoid injuring him. The defendant Company denied that the operator of the car in suit was negligent in any respect, and asserted that the accident was the result of the plaintiff's own negligence.

The case was tried to a jury. The defendant, at the close of the evidence, moved for a directed verdict in its favor. The motion was denied. The jury returned a verdict for the plaintiff. The court thereafter overruled the defendant's motion for judgment notwithstanding the verdict and alternative motion for a new trial. This appeal followed.

The defendant asserts that the plaintiff did not make a case for the jury under the Missouri humanitarian rule, and that the District Court should have directed a verdict for the defendant or should have granted it judgment notwithstanding the verdict. The defendant also asserts that the District Court erred in making certain rulings and certain remarks during the trial, and also erred in its instructions to the jury, and that the defendant is entitled to a new trial.

The vital and doubtful question in this case, we think, is whether the evidence, viewed in the light most favorable to the plaintiff, was sufficient to make the issue of liability under the applicable Missouri rule one of fact for the jury.

At the place where the accident occurred, there are three tracks of the defendant running north and south under Twelfth Street. The defendant's right-of-way, where the tracks are laid, is about forty feet wide. The subway is closed on the west side and there is a steep embankment on the east side.

Running along the top of this embankment is a wire fence, obviously intended to keep persons off the defendant's right-of-way. Twelfth Street, extending over the subway, is supported by steel pillars or posts, one series of which runs in the space between the two westerly tracks and the one easterly switch track of the defendant. The pillars are not over fifteen feet apart. Daylight enters the subway from the opening at the top of the east embankment, but the subway is in semi-darkness.

The plaintiff and another boy of the same age, who had absented themselves from school on the afternoon of April 24, 1951, passed through an opening in the wire fence at the top of the embankment and went down into the subway toward the defendant's tracks. The electric passenger car in suit was approaching from the south. The headlight of the car was not lighted, but the lights in the interior of the car were lighted. The car was equipped with a horn and a gong. The horn was like an automobile horn. Concededly, the horn was not sounded at any time before the accident. There is some conflict in the evidence as to when, before the accident, the gong was first sounded.

The motorman who operated the car, and who knew more than any one how the accident happened, testified that when he first saw the boys he was "about two car lengths from them, two and one-half"; that a car length is about 40 feet; that he sounded the gong because he considered that to be the most effective means of calling their attention to the approach of the car; that the car was then traveling about fifteen miles an hour; that he reduced the speed of the car; that the shortest distance in which the car could have been stopped would have been a car and a half length; that when he first saw the boys they were on the embankment at a point about two and one-half or three feet higher than the tracks and about 25 or 30 feet east of the track upon which the car was moving; that there was one track be-

tween the track the car was on and the place where the boys were standing; that he saw the boys start running toward the track on which the car was moving, when the car was about two or two and a half car lengths from them; that one boy never slowed up at all, but continued running directly toward the track; that the other boy did apparently hear the gong and stopped before reaching the track; that the last time he (the motorman) saw the plaintiff was just before the plaintiff ran over the switch track east of the track on which the car was moving; that the motorman saw the other boy stop, but that the pillars of the subway obstructed his view of the plaintiff until he struck the car.

We quote the following pertinent excerpts from the evidence of the motorman:

"After I saw the boys start to run toward the track I started braking down. They never done anything, like they even saw me or anything, and then I kept ringing the gong. Yes, they just kept running right toward the tracks. No, I never brought the car to a stop prior to the collision. I started ringing the gong when I first observed them, when I was two and one-half car lengths back, that's right. They started towards the tracks.

\* \* \* \* \* \*

"From the point where I first saw them [the boys] to where the one boy stopped was about twenty feet. It looked like the other boy hesitated, and then started out again, and then I lost sight of him, and I didn't know which one of the boys struck the car. One boy stopped, then started up again, then got behind the posts, and they obstructed my view. When that boy hesitated, I was about a car length from the point where the accident occurred. The shortest distance I could stop that car under the conditions at that time was about one and a half car lengths. No, when I saw the one boy hesitate, I didn't know whether the other boy had hesitated or not, I couldn't see him.

\* \* \* \* \* \*

" \* \* \* The one boy stopped and I never saw the other boy [plaintiff] stop. The last time I saw him he was running toward my track at the same rate of speed he had started, that's right. Yes, sir, the boys were out in the daylight under that open place along the bank. They were underneath the enclosure but the light was down from the bank on them, and I could see them. I knew they were boys. I didn't know how small they were. They looked to be boys nine years of age, that's right.

"Yes, sir, they ran a distance of 40 to 50 feet from where they started running until the Creek boy [plaintiff] reached the track on which I was operating. I rang my bell before they started to run. I rang my bell when I first saw them, and kept ringing it all the time.

"It seemed like they heard the bell and paid no attention, but one of them did stop. The Creek boy apparently paid no attention to the bell. Yes, sir, as far as I could tell he was unaware the car was coming.

"They did nothing except run on towards the track—straight for the track. I saw him [plaintiff] go behind that post at undiminished speed, that's right. He was looking straight towards the car—straight ahead towards the west, as he ran."

The motorman estimated that the speed of the car at the time of the collision had been reduced to eight miles an hour.

The plaintiff struck his head against the side of the car, back of the front door. The car was stopped approximately a car-length from where the collision occurred. The plaintiff was taken to a hospital.

We find it unnecessary to refer to the testimony of other witnesses. It is enough to say that, aside from evidence which might justify an inference that the gong was not sounded as promptly as the motorman said and that the car may have been moving at a greater speed than he estimated, his version of the

situation which resulted in the plaintiff's injuries was not seriously disputed.

From the evidence, viewed in the light most favorable to the plaintiff, we think it reasonably could be inferred that he ran directly from the position on the embankment where the motorman first saw him toward the track upon which the car was approaching; that he appeared to be and was unaware of the approach of the car; that the motorman knew, or in the exercise of due care could have known, that the plaintiff, in the semi-darkness of the subway, was unaware of the approach of the car; that the car could have been brought to a stop and the accident avoided, without danger to the passengers, if the motorman had attempted to stop the car when he first observed the boys starting to run toward the track upon which the car was moving; and that the zone of imminent danger to the plaintiff, because of his apparent obliviousness to the approach of the car, was not limited to the short distance within which the plaintiff might have saved himself by ending his dash toward the tracks, had he been conscious that the car was approaching.

In the case of Herron v. Wilson, 8 Cir., 186 F.2d 72, 74, this Court said:

" * * * The Missouri humanitarian rule applies to 'a plaintiff going into or continuing in peril, oblivious of the danger, though his being oblivious is due to his own negligence, and he could, if he would, avoid the impending danger. * * * Just where the danger zone commences, in any case where a person is proceeding toward the path of a fast moving train or automobile, is usually a doubtful matter, and it is a question of fact for the jury under the circumstances of that particular case, if there is a reasonable question about it.' Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S.W.2d 368, 370, 372. In this case, in which defendant's servants were charged only with ordinary care, the Missouri court held that it was not necessary that the circumstances be such as to convince the defendant that plaintiff was inattentive. 'It is enough that the circumstances are such as to indicate a reasonable chance that this is the case. Even such a chance that the plaintiff will not discover his peril is enough to require the defendant to make a reasonable effort to avoid injuring him.' 88 S.W. 2d at page 371.

" 'The extent of the danger zone where a person in imminent peril should be seen by the one causing the injury is a question for the jury.' Johnson v. Hurck Delivery Service, Inc., 353 Mo. 1207, 187 S.W.2d 200, 202. That the extent of the danger zone in a case of this kind varies with the facts in each particular case and that it is for the jury to say when a person approaching the path of a rapidly moving vehicle enters a place of danger and when his peril should have been discovered by the operator of the vehicle is ruled by many Missouri decisions."

See and compare Noland v. Pastor, 8 Cir., 191 F.2d 1009, in which it was held that, under the Missouri humanitarian rule, it was for the jury to say whether a motorist whose car struck a pedestrian who had walked into the path of the approaching car, apparently oblivious to its approach, had exercised due care to avoid the accident.

While we regard the issue of liability in this case as a close and doubtful one, we cannot say that the District Court either misconceived or misapplied the law of Missouri in ruling that that issue was, under the evidence, for the jury.

When the sufficiency of evidence to make a case for a jury presents a doubtful question of local law, this Court will accept the views of the trial judge unless convinced that they are erroneous. Russell v. Turner, 8 Cir., 148 F.2d 562, 564; Northern Liquid Gas Co. v. Hildreth, 8 Cir., 180 F.2d 330, 336; Coca Cola Bottling Co. of Black Hills v. Hubbard, 8 Cir., 203 F.2d 859, 861. While one reasonably may believe that the accident in this case was due to the motorman's misfortune, rather than neglect, we are not convinced that the court erred in refusing to direct a verdict for the

defendant. In the absence of evidence of the plaintiff's apparent obliviousness to his danger, a different situation would be presented. See Pentecost v. St. Louis Merchants' Bridge Terminal Railroad Co., 334 Mo. 572, 576, 66 S.W.2d 533, 535; Phillips v. St. Louis-San Francisco Railway Co., 337 Mo. 1068, 1072, 87 S.W.2d 1035, 1036; Lotta v. Kansas City Public Service Co., 342 Mo. 743, 751, 117 S.W.2d 296, 300.

■ At the opening of the trial, the plaintiff offered in evidence the deposition of the motorman of the car in suit. The defendant objected upon several grounds, one of which was that the witness was on his way to the courtroom and would be there within thirty minutes. The court overruled the objection. The witness subsequently appeared and testified as a witness for the defendant. The ruling of the court, whether right or wrong, was without prejudice. Concededly, there was no substantial difference between the evidence as contained in the deposition and that given by the witness at the trial.

■ During the examination of the motorman, the court rebuked him for laughing. Counsel for the defendant took exception to the remarks of the court to the witness as being uncalled for and improper. In his closing argument to the jury, counsel for the defendant took occasion to refer to this incident by saying, in substance, that it was not within the trial judge's province, but for the jury, to determine whether or not the witness was making light of the case or had intended to make light of it. This resulted in a colloquy between the court and counsel as to the right of counsel to argue that the witness had not, by laughing, been disrespectful to the court. At the close of the colloquy, the court told the jury that what he had said to counsel for the defendant about the right of the court to determine whether a witness was disrespectful had nothing to do with the case. In his charge to the jury, the court also included the following instructions:

"The court further instructs the jury to disregard the remarks of the court to Mr. Ely during his argument to the jury to the effect that it was the province of the jury and not the province of the court to pass upon the demeanor of the witness Thebeau, and that if the jury did not believe that the witness exhibited any intention to treat the case lightly, or to consider it as a 'laughing matter', the decision of the jury on that question is final."

In the case of Goldstein v. United States, 8 Cir., 63 F.2d 609, 613, which involved a somewhat analogous situation, this Court said:

" * * * It is impossible to gather from the cold record, particularly when it is in narrative form, the atmosphere of the trial itself, the manner in which the words were spoken, or the probable effect, if any, which they had upon the merits of the controversy. Critical remarks of the court frequently cut both ways, if they cut at all. * * * An appellate court should be slow to reverse a case for the alleged misconduct of the trial court, unless it appears that the conduct complained of was intended or calculated to disparage the defendant in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits."

It is unfortunate that the incidents to which the defendant refers occurred, but we find no adequate basis for a ruling that the remarks of the court, of which the defendant complains, were intended to injure the defendant or that they did injure it or that they prevented the jury from exercising an impartial judgment on the merits of the case.

The defendant contends that the court erred in instructing the jury as follows:

" * * * if you further find that the motorman employed by defendant operating the electric car saw plaintiff in such position of imminent peril, and that the motorman could thereafter, by the exercise of ordinary care, with the means and appliances at hand, and with safety to himself and other persons on

said electric car, have stopped the electric car, or given timely and adequate warning to plaintiff with the signaling device on said electric car, and thereby have prevented the injuries to plaintiff, but that the motorman failed to so stop said electric car or give such warning, and was negligent in so failing, and that said negligence directly caused or directly contributed to cause the injuries to the plaintiff, then you are instructed that plaintiff is entitled to recover in this case, and your verdict must be in favor of the plaintiff, and this is true even though plaintiff was a trespasser on defendant's property at the time, or that he was guilty of lack of care for his own safety."

This instruction is said to be erroneous because (1) it presented a hypothetical situation not supported by the evidence, (2) it directed a verdict for the plaintiff if the defendant's negligence "caused or directly contributed to cause" the plaintiff's injuries, (3) there was no evidence to show that after the plaintiff reached a position of imminent peril the car could have been stopped in time to avoid the accident, and (4) there was no adequate evidence of any failure to warn.

■ We think the defendant's criticism of the instruction is without substantial merit, since, in our opinion, there was evidence from which the jury could find that, because of the plaintiff's unawareness of the approach of the car, he was in a position of imminent peril from the time he started his dash toward the tracks, and could also find that the motorman, after discovering the plaintiff's danger and apparent unawareness of it, did not do all that reasonably might have been done to stop the car or adequately to warn the plaintiff of its approach, in order to avoid the collision. It is true that the evidence indicating that the motorman did not sound his gong until just before the collision occurred is negative in character, but the testimony of the motorman, who was an interested witness, was not itself invulnerable. Conceivably, the jury may have believed that the horn, which was not used, might have given a more adequate warning than the gong.

■ We think the District Court did not err in refusing to give an instruction requested by the defendant to the effect that if the jury found that the plaintiff was guilty of negligence which caused or contributed to his injuries, and "if you [the jury] find that after plaintiff came into a position of peril the motorman did not thereafter have a reasonable opportunity to stop the train or slacken its speed and that by the exercise of reasonable care he could not do so in time to avoid the injuries to plaintiff, then your verdict must be against the plaintiff and in favor of the defendant."

■ As we understand the Missouri humanitarian rule, the fact that the plaintiff was guilty of negligence in being in the subway and getting himself into a position of imminent peril had nothing to do with the liability of the defendant. In Noland v. Pastor, supra, 191 F.2d 1009, 1012, we said: "But under the applicable Missouri law called the 'humanitarian doctrine', any question as to such contributory negligence of plaintiff is irrelevant, Clifford v. Pitcairn, 345 Mo. 60, 131 S.W.2d 508". The District Court charged the jury that if they found that, after the plaintiff came into a position of imminent peril, the motorman did not have a reasonable opportunity to avoid the accident, their verdict must be for the defendant. We think that this instruction was more favorable to the defendant and less confusing to the jury than the one which the defendant requested, which, apparently, would have required a finding that the plaintiff was guilty of contributory negligence before the jury might have found that the motorman did not have a reasonable opportunity to avoid the accident.

The judgment appealed from is affirmed.