Saul Henry DAVIS, Jr., Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15228.

United States Court of Appeals
Eighth Circuit.

Jan. 23, 1956.

John W. Graff, St. Paul, Minn.
(Jerome Hoffmann and Hoffmann, Dona-
hue & Graff, St. Paul, Minn., were with
him on the brief), for appellant.

Alex Dim, Asst. U. S. Atty., St. Paul,
Minn. (George E. MacKinnon, U. S.

Atty., St. Paul, Minn., was with him on the brief), for appellee.

Before SANBORN, JOHNSEN and VAN OOSTERHOUT, Circuit Judges.

SANBORN, Circuit Judge.

Saul Henry Davis, Jr., and Wallace C. Anderson were, on September 9, 1954, charged jointly, by indictment, with two offenses. In the first count of the indictment they were charged with having knowingly, on or about July 8, 1954, persuaded and induced a woman to go by common carrier from Minneapolis, Minnesota, to Minot, North Dakota, for the purpose of prostitution. Section 2422, Title 18 U.S.C.A. The third count charged that Davis and Anderson, on or about July 7, 1954, at Minneapolis, Minnesota, conspired to commit the offense charged in the first count and committed certain overt acts in furtherance of the conspiracy. Section 371, Title 18 U.S.C.A.

Anderson entered a plea of guilty to these charges. Davis, upon his plea of not guilty, was tried, convicted by a jury and sentenced. Anderson was called by the Government as a witness at the trial and testified against Davis. Davis has appealed.

The sufficiency of the evidence to support the conviction of Davis is unchallenged. His contentions are that he did not have a fair trial because (1) inadmissible and prejudicial evidence was received at the trial, and (2) the court made improper and prejudicial remarks during the trial.

It is unnecessary to state in complete detail the evidence adduced at the trial. We have had recourse to the original as well as the printed record and know all that occurred at the trial. According to the evidence of the Government, it appeared that Davis in June and July, 1954, was operating a barbecue place or cafe and a house of prostitution, adjoining it, in Minot, North Dakota; that Anderson, his co-defendant, called him long distance from Saginaw, Michigan, in June, 1954, with respect to having a woman named Maxine, with whom Anderson had been living, come to Davis' place in Minot for purposes of prostitution; that Maxine went from Saginaw, Michigan, to Minot and engaged in prostitution for Davis, dividing her earnings as a prostitute with him; that while Anderson was in Minot, on or about June 21, 1954, he arranged with Davis to try to find white girls for him; that Anderson was to telephone Davis if successful; that on or about July 7, 1954, Anderson met in Minneapolis a twenty-year old white girl known as Mickey, who, he advised Davis by telephone, would come to Minot to engage in prostitution for him; that Davis told Anderson he would send money for her fare, and wired Anderson twenty dollars; that Anderson purchased a bus ticket for Mickey from Minneapolis to Minot, so she could go there and work for Davis as a prostitute and also send Anderson money out of her earnings; that Mickey went to Minot and met the colored girl Maxine, who told her she was expected; that Maxine took her to the home of Davis nearby; that Davis explained the rules of the house and gave her a rent receipt for $40.00, although she paid him nothing; that Maxine and Mickey and another woman acted as waitresses at the cafe and made their "deals" there and took their patrons or "tricks" to a house adjoining and in front of the cafe, used as a house of prostitution; that Mickey began working as a prostitute the first night she was there; that she was to have half of her earnings as a prostitute; that each girl had an envelope in which she would put her earnings, marking the amount on the outside of the envelope and putting it on a shelf in the kitchen of the cafe; that Mickey became ill, apparently on the day after her arrival, and required medical care; that she and Maxine left for Minneapolis on July 11, 1954, and Mickey did not return; that they were met in Minneapolis by Anderson, who wanted money from Mickey, but that she had none; and that, after searching her purse, Anderson drove her to her mother's home.

There was documentary evidence to substantiate the telephone calls from Anderson to Davis, the bus trip of Mickey from Minneapolis to Minot, and the telegraphing by Davis of the twenty dollars which Anderson received and with which he purchased the bus ticket for Mickey.

The evidence of the Government, at the close of its case, was inconsistent with any conclusions other than that Davis was the operator of a house of prostitution in Minot, and that he had arranged with Anderson, a procurer, to send Mickey from Minneapolis to Minot for purposes of prostitution and had sent money to Anderson to pay for her trip to Minot.

Davis took the stand and testified in his own behalf: that he had lived in Minot since 1943; that he played baseball, coached baseball teams, did cement and carpenter work, acquired tax title real estate and bought old houses and moved them onto it; that he and his wife fixed them up and accumulated what they had; that the houses are in the "colored section" of the City; that he had made it a practice to furnish quarters for colored people coming through Minot; that he owned the building in which his cafe, known as the Bar-B-Q, was located, and operated it; that he first saw Maxine on June 8 or 9, 1954, when she called up from the station and asked for a room until she could get married in August to a porter on the Northern Pacific; that he gave her a room, for which he charged $11.25 per week; that she worked as a waitress at the cafe from ten o'clock at night until morning, when it closed; that she never told him that she was a prostitute; that he got no money from her for prostitution; that she put no money in an envelope and left no envelope on a shelf in the cafe.

Davis further testified that he first met Anderson, his co-defendant, in Minot, about June 20 or 21, 1954; that Anderson came to visit Maxine; that he said he was going out on his run from St. Paul to Seattle on the Northern Pacific and wanted Maxine to stay until he got located; that he (Davis) had never talked to Anderson over the telephone or otherwise before that time in Minot; that Anderson told Davis that when he got back from his run he would buy an outboard motor for Davis at a reduced price, bring it to Minot and pick up Maxine and take her to Minneapolis; that they talked about fishing; and that Davis said he would send him some of the money for the motor, but not all of it.

With respect to Mickey, Davis testified that she was brought to his back door by Maxine, who said Mickey was a friend who wanted a room; that Mickey told him she was colored and Indian and wanted a place to stay until she obtained a divorce from a cruel husband; that he told Mickey he would have to have money in advance and she paid him $40.00, for which he gave her a receipt for room rental from July 9, 1954, to August 9, 1954; that Mickey arrived in Minot on July 9; that Davis' wife got a doctor for Mickey on the day of her arrival; that she left Minot by train on July 11, without asking that any of her rental money be refunded; that she said she might be back, and he held her room for her; that Maxine left with Mickey, but returned [about July 18, 1954]; that Mickey was never in the cafe as a waitress or at all; that he knew nothing about her being a prostitute in Minot; that he was not running a house of prostitution; that he never told Anderson that he wanted a white girl for any purpose, and had no conversation with him about Mickey; and that the money he sent Anderson under an assumed name was for an outboard motor.

Davis also testified, on direct examination, that in June and July, 1954, his wife was helping in the cafe; that at night, around 12:00 or 12:30, she would come over and help in the kitchen, and on some nights would stay until the cafe closed; that he did not divide earnings from any source with any woman except his wife, "as my wife and I own these properties together and what came in was our joint money"; that the cafe was about a half block from his home; that

the house which the Government's testimony showed to be a house of prostitution was rented during June and July of 1954 to a Mrs. Rogers for $45.00 a month; that he had done nothing he knew of to assist in transporting any woman intending that she should enter a house of prostitution; that if the house in front of the cafe was one, he did not know what was going on there; that his property has become valuable and that since it has increased in value "they have been trying to move us all out of there"; and that he has had some trouble with police officers who were trying "to down me a little bit so as to make me sell."

During his direct examination, Davis was asked by his counsel what, if any, trouble he had had with the law—whether he had been convicted of any felony "before". He answered, "No, I haven't." He was asked, "Have you had some trouble out there in Minot?" His answer was: "Well, I drink a little. I have been arrested." On cross-examination, Davis testified, without objection, that he had been arrested many times for drunkenness. He was asked whether his wife, Ann M. Davis, engaged in prostitution. He said, "No." He was then asked whether she was not arrested for prostitution in 1950 or 1951. The question was objected to as improper, immaterial and prejudicial. The objection was overruled. Davis was then asked, "Talking about your wife, she was arrested and convicted for engaging in prostitution?" The question was not objected to. He answered, "She was not."

The following question was then asked: "Isn't it a fact, Mr. Davis, that on May 1, 1950, Ann Davis, Mrs. Saul Davis, pled guilty in Court in Minot, North Dakota, of keeping a disorderly house at 318 Third Street Southwest, Minot, North Dakota [Davis' residence]?" No objection was taken to the question. He answered that he was in Hobbs, New Mexico, and knew nothing about that. Davis was asked whether on July 27, 1950, his wife was arrest-

ed "for soliciting for prostitution at 318 Third Street Southwest." That was objected to as improper cross-examination. After some colloquy between court and counsel, the court said to counsel for Davis, "You object to the whole subject matter, don't you?" Counsel's answer was: "No. Just referring to arrests and particularly someone not the witness." The objection was overruled. Davis was then asked, "On July 27, 1950, isn't it a fact that Ann M. Davis, your wife, was arrested for prostitution?" The question was not objected to, and his answer was, "I was in Hobbs, New Mexico." The next question was: "That was July 27th. On May 1, 1950, didn't your wife plead guilty for the operation of keeping a disorderly house at 318 Third Street Southwest?" Davis' answer was, "I was in Amarillo, Texas."

During a recess at that stage of the trial and in chambers, counsel for Davis moved that all testimony relative to Ann Davis' convictions be stricken and the jury be instructed to disregard it, and that all reference to any police records be stricken. After a discussion, the court announced that a ruling would be deferred.

On redirect examination Davis testified that his wife had at one time been charged with prostitution but had been acquitted. On recross-examination, Davis, was asked the following question: "And I will ask you if it has now come to your remembrance the question of the fact she was arrested for operating a disorderly house at 318 Third Street, Southwest, your home?" This was objected to as improper cross-examination. The court then said: "At the present condition of the record I am going to sustain all of Mr. Tautges' [counsel for Davis] motions made during recess. They can be renewed at an appropriate time by the Government lawyer, but now all of that testimony as to her being held for prostitution on the various charges is sustained. *The jury will disregard it all.*"

Thereafter Government counsel, in chambers, made an offer to prove the ar-

rests and convictions of Davis' wife for prostitution, about which inquiry was made in the cross-examination of Davis, by the official police records of the Police Department of Minot, North Dakota, to show that the cross-examination of Davis relative thereto was made in good faith and as tending to show that his wife, as late as 1950, was engaged in operating a house of prostitution, and for the purpose of proving the kind of place he and his wife were operating in Minot. The offer of proof was in all respects denied.

The court denied a motion for a judgment of acquittal. There were no requests for instructions. Counsel for the Government in his argument to the jury made no allusions to the arrests or convictions of the wife of Davis and never referred to her in any way. Counsel for Davis, in his argument, said to the jury:

"Now, there have been indications in the trial here about possible other offenses. There was some reference made to some possible arrests. Well, of course, an objection was taken to that and you are going to be instructed by the Court to disregard any reference to any difficulty that may have been intimated that Mrs. Davis had. That evidence is not before you and the Court will tell you that you must reject it without qualification."

The trial court, in instructing the jury, said:

"You must not consider for any purpose any evidence offered and rejected, or which has been stricken out by the Court. Such evidence is to be treated as though you never had heard it, particularly the testimony with reference to the wife of the defendant being arrested for prostitution which was admitted by the Court and afterwards stricken out."

No objections were made or exceptions taken to the charge of the court, and no corrections or additions were suggested or asked for.

This Court is now asked to rule that the cross-examination of Davis with respect to his wife's difficulties with the local police was so improper and prejudicial as to vitiate the conviction of Davis and to entitle him to a new trial, notwithstanding that the evidence elicited from Davis in that regard was stricken from the record and the jury instructed to disregard it.

It cannot be said that evidence that the wife of Davis had engaged in prostitution would have no tendency whatever to characterize the establishment he was operating with her help, the earnings from which, according to his testimony, were divided between them. According to the evidence of the Government, those earnings included earnings derived from the prostitution of the women who worked in the cafe. Davis should not have been asked about his wife being arrested for prostitution, since an arrest is in the nature of a mere accusation and is not evidence that the person arrested has committed the offense charged. As this Court said in Pittman v. United States, 8 Cir., 42 F. 2d 793, 797, "Many innocent men are arrested", and, "The lay mind does not stop ordinarily to distinguish between accusation of crime and conviction thereof." See, also, Coulston v. United States, 10 Cir., 51 F.2d 178, 182. However, it is to be noted that Davis, on his direct examination, first injected the question of arrests into the trial.

The questions about the convictions of the wife of Davis in the police court of Minot stand in a somewhat different situation, since they had some tendency to show what kind of a place it was probable that Davis and his wife were maintaining. It may be doubtful whether the questions about convictions constituted improper cross-examination. A trial court has a rather broad discretion with respect to cross-examination of a witness as to collateral matters.

Mr. Justice Sutherland, sitting as a Circuit Justice in the case of United States v. Manton, 2 Cir., 107 F.2d 834, 845, said:

"* * * The office of cross-examination is to test the truth of the statements of the witness made on direct; and to this end it may be exerted directly to break down the testimony in chief, to affect the credibility of the witness, or to show intent. The extent to which cross-examination upon collateral matters shall go is a matter peculiarly within the discretion of the trial judge. And his action will not be interfered with unless there has been upon his part a plain abuse of discretion. 3 Wharton's Criminal Evidence (11th Ed.) § 1308. See Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624. * * *"

See, also, Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680; Lovely v. United States, 4 Cir., 175 F.2d 312, 314, and Hewitt v. United States, 8 Cir., 110 F.2d 1, 8–9.

■ We think that the cross-examination of Davis, in so far as it may have been improper, does not require a reversal of his conviction. The record shows that counsel for the Government acted in good faith and in the belief that the cross-examination was proper. He was in a position to establish that the wife of Davis had been arrested and convicted of prostitution in Minot.

It is true, as this Court said in Salerno v. United States, 8 Cir., 61 F.2d 419, 424, that, "When, in the prosecution of a defendant, counsel for the government indulges in unfair and improper cross-examination, the only purpose of which is to degrade the defendant and to prejudice the jury against him, the government, upon appeal, will not ordinarily be heard to say that the methods which were used did not have the effect which they were obviously intended to have." See, also, Echert v. United States, 8 Cir., 188 F.2d 336, 341–342. In the in-

stant case the cross-examination which is complained of was not indulged in for the sole purpose of degrading Davis. The fact that the cross-examination of a defendant exceeded the bounds of propriety does not call for reversal unless it was prejudicial and amounted to a denial of some substantial right of the defendant. Morgan v. United States, 8 Cir., 98 F.2d 473, 476–477 and cases cited.

■ In the instant case, the cross-examination elicited from Davis little, if any, evidence of a damaging character, and the trial court struck out all such evidence and instructed the jury to disregard it. We have no right to assume that the jury did not follow the directions and instructions of the court. In Dolan v. United States, 8 Cir., 218 F.2d 454, 460, this Court said:

"The general rule is that where evidence is erroneously admitted the subsequent striking of it from the case, accompanied by a clear and positive instruction to the jury to disregard the evidence, cures the error. But if the evidence is of such an exceptionally prejudicial character that its withdrawal from the consideration of the jury cannot remove the harmful effect caused by its admission, a new trial will be granted."

■ The issues whether Davis knowingly participated in inducing the girl Mickey to travel to Minot to engage in prostitution and whether he and Anderson by concerted action brought that about, were simple and understandable issues. It is not conceivable to us that the improper cross-examination of Davis, and the evidence elicited therefrom, which the jury was instructed to disregard, contributed to his conviction. If Davis was not satisfied that the instruction of the court directing the jury to disregard the evidence complained of was sufficiently clear and positive, he should have asked the court for a further instruction in that regard. When a party might have had all that he was

entitled to in the way of instructions from the trial court, he is not in a position to complain of the court's instructions to which no exception was taken. Pennsylvania Railroad Co. v. Minds, 250 U.S. 368, 375, 39 S.Ct. 531, 63 L.Ed. 1039; Hall v. Aetna Life Ins. Co., 8 Cir., 85 F.2d 447, 450–451.

"Whether prejudice results from the erroneous admission of evidence at a trial is a question that should not be considered abstractly or by way of detachment. The question is one of practical effect, when the trial as a whole and all the circumstances of the proofs are regarded." Williams v. United States, 8 Cir., 265 F. 625. See and compare, Holmes v. Goldsmith, 147 U.S. 150, 164, 13 S.Ct. 288, 37 L.Ed. 118; Kotteakos v. United States, 328 U.S. 750, 763–767, 66 S.Ct. 1239, 90 L.Ed. 1557; Lutwak v. United States, 344 U.S. 604, 619–620, 73 S.Ct. 481, 97 L.Ed. 593; Miller v. United States, 8 Cir., 21 F.2d 32, 36–38, certiorari denied 276 U.S. 621, 48 S.Ct. 301, 72 L.Ed 735; Hewitt v. United States, 8 Cir., 110 F.2d 1, 9 and cases cited; Snead v. United States, 4 Cir., 217 F.2d 912, 915.

█ The remarks of the trial court which Davis contends made his trial unfair were not directed to him but to his counsel, and were not intended or calculated to prejudice Davis in any way. The entire subject of asserted prejudice resulting from remarks of a trial court to counsel for a defendant is adequately dealt with in Goldstein v. United States, 8 Cir., 63 F.2d 609, 612–614. On the authority of that case, the contention that the trial court's remarks in the instant case amounted to prejudicial error is overruled. See and compare, United States v. Warren, 2 Cir., 120 F.2d 211, 212; Throckmorton v. St. Louis-San Francisco Railway Co., 8 Cir., 179 F.2d 165, 169; Illinois Terminal R. Co. v. Creek, 8 Cir., 207 F.2d 475, 480; Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680.

The judgment appealed from is affirmed.

VAN OOSTERHOUT, Circuit Judge (dissenting).

I am unable to agree with the majority opinion and therefore dissent. The issues and facts are set out in the majority opinion.

The district attorney in his cross-examination of the defendant on three separate occasions at widely separated intervals asked the defendant in substance whether his wife had been arrested for prostitution on designated dates in 1950. Such questions were objected to as improper impeaching questions and improper cross-examination upon subject matter not covered on direct examination, and on the further ground that the wife's arrests were not a proper subject of inquiry. The defendant also moved for a mistrial because of the prejudicial questions. The majority, citing adequate supporting authority, correctly concluded that Davis should not have been asked about his wife's arrests. The majority opinion then goes on to say that Davis first injected the question of arrests into the trial. It is true that Davis on direct examination admitted that he had been arrested many times for intoxication. Mrs. Davis was not a party to this action, nor was she a witness at the trial. There is nothing in defendant's direct examination which would open the field of cross-examination to include Mrs. Davis's arrests. The district attorney also on cross-examination over appropriate objections questioned the defendant about his wife's arrests and conviction for offenses in 1950. The Government by offer of proof which was rejected proposed to show that Mrs. Davis on May 1, 1950, entered a plea of guilty in police court at Minot, North Dakota, to a charge of keeping a house of ill fame in April of 1950 contrary to ordinance of the City of Minot and was sentenced to pay a fine of $45. It is noted that the defendant was a professional baseball player and was so engaged in April 1950 at Hobbs, New

Mexico. A further offer was made to show that Mrs. Davis was convicted in the Minot police court on a charge of prostitution in July 1950. However, this case was appealed to the State court, and the trial there resulted in an acquittal.

The Mann Act and conspiracy charges involved in the present case arose out of events alleged to have occurred in 1954. The trial court, after repeatedly overruling defendant's objections to the cross-examination pertaining to his wife's alleged convictions and arrests, ultimately sustained defendant's motion to strike all such testimony and, as stated by the majority, advised the jury to disregard such testimony. The following colloquy between defendant's counsel and the court then took place:

"Mr. Tautges: Will Your Honor advise the jury to disregard it?

"The Court: I just said that. I am going to treat this record as is, not as you may hope to prove it."

It is difficult to comprehend just what idea the court intended to convey by the last sentence quoted and what meaning the jury might give to such a statement. It certainly made less clear the previous statement of the court that the jury should disregard the disputed testimony. At one point while Government counsel was cross-examining the defendant on his wife's arrests, such attorney had before him the records pertaining to the arrests. The defendant's counsel objected to Government counsel reading from such records not in evidence. The following discussion then took place:

"The Court: What are those instruments that you have there that prove this thing?

"Mr. Dim: These are police records, Your Honor.

"The Court: Police records. Why don't you put them in evidence?

"Mr. Dim: I will when the proper time comes, Your Honor."

The foregoing conversation in the presence of the jury tended to place before the jury and emphasize the testimony pertaining to Mrs. Davis's 1950 criminal record.

I am convinced that the testimony as to Mrs. Davis's conviction and arrests in 1950 was improper cross-examination and that the trial court was right when it ultimately excluded such testimony. It is true, as stated by the majority, that generally the trial court has a large discretion with respect to the scope of cross-examination of a witness as to collateral matters. However, this discretion is subject to limitation. In Harrold v. Territory of Oklahoma, 8 Cir., 169 F. 47, at pages 51, 52 & 53, a case often quoted and referred to, this court states in part:

"Statements in the opinions of courts are called to our attention to the effect that the limit of cross-examination is discretionary with the trial court, but it is only discretionary without the limits of the right of the party against whom a witness is called to a full and fair cross-examination of him upon the subjects of his direct examination, and the right of the party in whose behalf he testifies to restrict his cross-examination to the subjects of his direct examination. * * *

"The converse of this rule is equally controlling. The party on whose behalf a witness is called has the right to restrict his cross-examination to the subjects of his direct examination, and a violation of this right is reversible error. * * *

"* * * But the line of demarcation which limits a rightful cross-examination is clear and well defined, and it rests upon the reason to which attention has been called. It is the line between subjects relative to which the witness was examined upon the direct examination and those concerning which he was not required to testify. * * *"

See also, Gideon v. United States, 8 Cir., 52 F.2d 427, 429; Havener v. United States, 8 Cir., 15 F.2d 503, 506; Tucker v. United States, 8 Cir., 5 F.2d 818, 823;

Salerno v. United States, 8 Cir., 61 F.2d 419, 423; Lovely v. United States, 4 Cir., 175 F.2d 312, 313. Moreover, even if the reception of the disputed testimony was within the trial court's discretion, the trial court's final conclusion was that such testimony should be excluded.

Error was committed in permitting the defendant to be cross-examined as to his wife's alleged offenses in 1950. As hereinabove stated, the error was repeated a number of times and thus the improper testimony was unduly emphasized. The withdrawal of such testimony in the manner it was here accomplished did not remove the effect of the evidence erroneously received. As stated by Justice Jackson in his concurring opinion in Krulewitch v. United States, 336 U.S. 440, at page 453, 69 S.Ct. 716, at page 723, 93 L.Ed. 790:

> "The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 257 [92 L. Ed. 154], all practicing lawyers know to be unmitigated fiction."

The question of whether the error hereinabove discussed is prejudicial is a very close one. I fully agree with the majority that there is ample evidence outside of the disputed cross-examination to sustain the conviction. However, it is usually extremely difficult to determine the effect of specific testimony on a jury. The test to be applied in determining whether the error committed is prejudicial is fully discussed by Justice Rutledge in Kotteakos v. United States, 328 U.S. 750, at page 765, 66 S.Ct. 1239, at page 1248, 90 L.Ed. 1557, where it is stated:

> " * * * But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The

inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

See also Echert v. United States, 8 Cir., 188 F.2d 336, 26 A.L.R.2d 752; Krulewitch v. United States, supra.

The crucial witnesses for the Government in this case were Anderson who pleaded guilty to the offenses charged in the present indictment, and two admitted prostitutes, all of whose testimony was squarely contradicted by the defendant. True, there was corroboration by disinterested witnesses as to some of the Government testimony, such as that relating to transportation and phone calls. After examining the entire record as a whole, I am unable to say with certainty that the injection of the wife's alleged offenses into the record might not substantially affect the verdict. Further, it seems apparent to me that the Government counsel knew, or should have known, that he was going beyond the bounds of proper cross-examination in pressing the questions relative to the wife's arrests in 1950. In Salerno v. United States, supra, 61 F.2d at page 424, this court said:

> "The general rule is that such improper cross-examination constitutes reversible error. * * * When, in the prosecution of a defendant, counsel for the government indulges in unfair and improper cross-examination, the only purpose of which is to degrade the defendant and to prejudice the jury against him, the government, upon appeal, will not ordinarily be heard to say that the methods which were used did not have the effect which they were obviously intended to have. * * * "

See also Havener v. United States, supra; Echert v. United States, supra; State v. Comes, 245 Iowa 485, 62 N.W. 2d 753, 757.

Except to the limited extent hereinabove noted that the inadvertent remarks of the trial judge tend to emphasize the testimony improperly received on defendant's cross-examination, I would agree with the majority that there was nothing in the record to support defendant's contention that the remarks of the trial court deprived the defendant of a fair trial.

I would reverse the judgment of conviction and remand the case to the District Court for a new trial.